**Trenton MILLENDER, # 243075, Petitioner,**

v.

**Stanley ADAMS, Respondent.**

**No. CIV.A.99–CV–70945–DT.**

United States District Court, E.D. Michigan, Southern Division.

Feb. 8, 2002.

---

John F. Royal, Detroit, MI, for petitioner.

Janet Van Cleve, Lansing, MI, for respondent.

### OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

ROSEN, District Judge.

Trenton Millender ("Petitioner"), presently confined at the Riverside Correctional Facility in Ionia, Michigan, has filed this petition for a writ of habeas corpus pursu-ant to 28 U.S.C. § 2254 through counsel. In his application, petitioner challenges his conviction after a jury trial for three counts of first degree criminal sexual conduct, M.C.L. 750.520b; three counts of armed robbery, M.C.L. 750.529; one count of assault with intent to do great bodily harm, M.C.L. 750.84; three counts of felonious assault, M.C.L. 750.82; and one count of possession of a firearm during the commission of a felony, M.C.L. 750.227b. For the reasons set forth below, the petition for writ of habeas corpus is **DENIED**.

### I. Factual Background

Petitioner's convictions arise out of armed robberies, sexual assaults, and other assaults which took place at the home of Elizabeth Wade in Detroit, Michigan, on July 11, 1994 at about 12:00 midnight. Mrs. Wade and her husband were out of town at the time. Her eighteen year old granddaughter Jermeka Roach was watching the house for her. Jermeka Roach's twenty-four year old boyfriend Corie Robinson, Corie Robinson's twenty-five year old sister, Tina Robinson, and three youths, Lisa Wells, age fourteen, Eugene Wells, age twelve, and Damon Brown, age fifteen, were also in the house when the home invasion took place.

At about midnight on Monday July 11, 1994, Tina Robinson, Corie Robinson, and Jermeka Roach left the house to put some gas in Tina Robinson's car. Tina and Corie walked ahead and Jermeka followed behind. Lisa Wells, Eugene Wells, and Damon Brown were asleep in one of the bedrooms. Someone shouted to the persons who were leaving the house to get back inside. Jermeka Roach ran back inside and hid in her grandparent's room beside the bed. The intruders forced Tina Robinson and Corie Robinson into the house at gunpoint. Two of the intruders

were wearing ski masks. A third intruder carrying a long gun was not masked.

One of the intruders ran to the room where Jermeka Roach was hiding, paused, then went to the bedroom where the children had been sleeping. He forced the children to get up, hit Damon Brown with a hard object, and ordered them to get into the bathroom where he shut the door behind them. Jermeka Roach came out of her hiding place when she heard the intruders saying they were going to kill them if the missing person did not come out.

When Jermeka Roach came out of her grandparents' bedroom, a masked intruder referred to by the other intruders as "T–Bone" or "T" grabbed her by the neck. This intruder's eyes, nose, and square-shaped gold metal framed eyeglasses were visible through the holes in his ski mask. Transcript Volume I ("Tr.Vol.I") at 102. This intruder held a black handgun to Jermeka Roach's head during much of the incident. He ordered her to accompany him on a search for valuables throughout the house. The intruder forced Jermeka Roach to go to her grandparents' room where several hundred dollars cash was found in a dresser drawer. "T–Bone" also found and took a camcorder, a cell phone, and two long guns from the grandparents' room after a lengthy search through all of the dresser drawers, and the clothes in the closet. He also took some jewelry that was hanging from a chandelier.

"T–Bone" next forced Jermeka Roach to go to the living room where another intruder was holding Tina and Corie Robinson at gunpoint. Tina and Corie were laying on the floor naked. Jermeka Roach eventually identified the other masked intruder as Ericke Peterson and the unmasked intruder as Brian Maxwell. Al-though she could only see his eyes through his mask, she knew Ericke Peterson from prior contacts at her cousin's house and recognized him during the home invasion. Ericke Peterson ordered Jermeka Roach to take her clothes off and lay down on the floor, which she did.

Ericke Peterson ("Peterson") and "T–Bone" began talking about how much money had been found to that point. Peterson threatened to kill the victims or cut off their fingers if they did not get the amount of money they came for. "T–Bone" told Jermeka Roach that she knew where the drugs and money were and that she'd better produce them. She told him he had the wrong house. "T–Bone" put his gun to her head and threatened to blow her head off. Jermeka Roach testified that she was "scared, terrified" at that point.

Ericke Peterson then asked Jermeka Roach if she wanted to get raped. She said no. He asked her again, this time pointing his gun at her. She said yes. Peterson then forced Tina Robinson to perform oral sex on him. Peterson then ordered Tina Robinson to go into the kitchen where he forced her to submit to penile-vaginal penetration on the kitchen table.

Jermeka Roach identified Petitioner during his trial as the masked intruder referred to as "T–Bone." She also testified that a pair of glasses shown to her by the prosecutor appeared similar to the glasses "T–Bone" was wearing that night. Roach first identified Petitioner at an in-person lineup held on July 28, 1994, on the basis of his appearance and his voice.[1] Tr. Vol. II at 9. Roach testified that she had seen Petitioner at her cousin's funeral about a year before the home invasion. Tr. Vol. I at 136.

---

1. The subjects in the lineup were required to speak different phrases spoken during the crime, as well as present themselves for visual observation.

Jermeka Roach testified that "Trenton, he was over me, and he had stuck the gun in my vagina and asked me did I want to get shot or whatever." Tr. Vol. I at 116. Petitioner did not shoot her, but kept saying that she "better come up with some more money or else he was going to kill me." Tr. Vol. I at 117. "T–Bone" then left Jermeka Roach and went over to her boyfriend, Corie Robinson.

"T–Bone" tried to extract information about additional valuables from Corie Robinson by breaking several of his fingers with a pair of pliers. He held the pliers in his right hand while pointing the gun at Corie Robinson with his left hand. Corie was unable to offer any information about additional valuables.

Corie Robinson identified Petitioner at trial as the masked intruder referred to as "T–Bone" who had broken his fingers at gunpoint while demanding information about more valuables. Corie Robinson did not identify Petitioner at the July 28, 1994 in-person lineup. Further, he identified another subject in the lineup as the perpetrator. He did not recall whether he was told that he had identified someone other than Petitioner. Corie Robinson testified at the trial that he had seen Petitioner one time before the incident, at Grace Hospital where Petitioner had come with Ericke Peterson, Dericke Peterson, and Donwell Harris to visit Donwell Harris's mother. Corie Robinson testified that this hospital visit took place "[t]hat Sunday before." Tr. Vol. II at 73. Donwell Harris was another grandchild of Elizabeth Wade and a cousin of Jermeka Roach.

Petitioner then returned to Jermeka Roach, still armed with the pliers and his handgun. Pointing the handgun at her chest, Petitioner squeezed her hands and fingers, without breaking any of them. Petitioner threatened to start breaking fingers and toes if he was not told the whereabouts of more money. Jermeka Roach was unable to tell Petitioner about any more money because there wasn't any more to tell about. Tr. Vol. I at 118.

Shortly thereafter, someone called loudly from outside the house that it had been fifteen minutes and that it was time to go. The intruders then forced the two adult female victims to crawl and walk to a basement closet where they were shut inside with the child victims who had been taken there earlier. Some time later, Corie Robinson went downstairs and let the others out of the closet. When they went back upstairs, the intruders were gone. It was undisputed that the intruder identified as Petitioner wore a ski mask throughout the entire incident and spoke to or in the presence of many of the victims during the incident.

Tina Robinson testified that Ericke Peterson forced her to have oral and vaginal sex with him at gunpoint. At trial, she identified Petitioner as the man who had broken her brother Corie Robinson's fingers with pliers. However, she did not identify Petitioner as one of the perpetrators at the July 18, 1994 in-person lineup. Further, she identified someone else as the perpetrator at Petitioner's lineup and was subsequently told that she had not identified Petitioner. Tr. Vol. II at 27–29. When asked at trial how she was able to identify Petitioner as one of the perpetrators, she replied, "[b]y his height." Tr. Vol. II at 26.

Lisa Wells testified that she was awakened by the noise of someone being beaten in the living room the night of the incident. She pretended to be asleep. A masked man wearing glasses and armed with a handgun whom she later identified as Trenton Millender came into the bedroom and turned on the light. The man left briefly, returned, and began beating her cousin Damon Brown. The man took the three children to a nearby bathroom and

forced them into it. Lisa and Eugene Wells laid down on the floor. Petitioner hit Damon Brown with his handgun, knocking him down and making blood fly everywhere. Lisa Wells identified Petitioner at trial. She also identified him at the July 28, 1994 in-person lineup. She testified at trial that she identified Petitioner at the lineup by his voice alone and that she had been able to see him while he was speaking at the lineup. Tr. Vol. II at 95–98.

Eugene Wells testified that he woke up the night of the incident when he heard his cousin Damon Brown being beaten by Petitioner. Petitioner was masked and was wearing glasses. Eugene Wells identified Peterson as the other masked intruder. Eugene realized that the other masked intruder was Ericke Peterson because Peterson called Eugene "bad luck" because Peterson had gone to jail on Eugene's birthday. The other masked intruder besides "T–Bone" called Eugene "bad luck" during the incident. No one else ever called him that. Eugene Wells heard the intruders talk during the incident. Eugene Wells identified Petitioner at trial and at his July 28, 1994 in-person lineup as one of the masked intruders. He recognized Petitioner at the lineup by his glasses. Tr. Vol. II at 110. The police did not tell him that he had picked out the man they wanted at the lineup. Tr. Vol. II at 111.

Damon Brown testified that, at the beginning of the incident, a masked man came into the bedroom where he was sleeping with his cousins Lisa and Eugene Wells, grabbed him and hit him repeatedly with a gun on the head. He was taken to the bathroom with his cousins Lisa and Eugene Wells where he was again hit on the head and knocked into the bathtub. He heard another intruder call the man who hit him "T–Bone." Tr. Vol. II at 116. Damon Brown heard the intruders speak to each other during the incident. He described the man who had hit him to the police as tall, wearing glasses, and skinny. Tr. Vol. II at 121. He did not identify Petitioner at the in-person lineup. Tr. Vol. II at 122. Nor did he identify anyone else at the lineup.

Donwell Harris testified that he saw Ericke Peterson and Petitioner talking on July 13, the Wednesday after the incident. Donwell Harris also testified that Petitioner went to Grace Hospital with him, Ericke Peterson, and Dericke Peterson once when he (Donwell Harris) went there to visit his mother who was ill and died that week. Tr. Vol. II at 143. This visit took place before the criminal episode at Elizabeth Wade's home on Meyers street. Donwell Harris did not state when the hospital visit took place, nor did he testify that Corie Robinson was also present. Tr. Vol. II at 143. Donwell Harris testified that the only nickname he ever heard Petitioner called was "Trent." Tr. Vol. II at 141.

Petitioner has submitted affidavits from himself and various family members and a friend, as well as copies of motel bills and wedding party announcements indicating that he was in Franklin, Tennessee on Saturday, July 9, 1994, and was either still there or returning from there on Sunday, July 10, 1994. That Sunday was the day before the criminal episode at issue in this case and the day Petitioner asserts Corie Robinson was referring to when he stated he had been at the Grace Hospital with Petitioner and others visiting Donnell Harris's dying mother "[t]hat Sunday before" the home invasion which occurred about 12:00 midnight, Monday, July 11, 1994.

Shawna Turner testified that she was Brian Maxwell's girlfriend and was living with him in July of 1994 when the police came to their residence and seized a number of items. She further testified that

Petitioner had recently visited Brian Maxwell at their residence that same month. Tr. Vol. III at 22–23.

Petitioner's convictions were affirmed on appeal. *People v. Millender*, 186524 (October 11, 1996); *rehearing den.* 186524 (January 10, 1997); *lv. den.* 456 Mich. 913, 572 N.W.2d 660 (1997); *reconsideration den.* 456 Mich. 913, 575 N.W.2d 559 (1998).

Petitioner has now filed an application for a writ of habeas corpus presenting the following issues:

I. WHERE TRIAL COUNSEL REPEATEDLY PERFORMED IN A DEFICIENT MANNER DURING HIS REPRESENTATION OF THE DEFENDANT, AND WHERE THIS DEFICIENT PERFORMANCE PREJUDICED THE DEFENSE, THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW.

II. WHERE THE DEFENDANT HAS A DUE PROCESS RIGHT TO A PROPERLY INSTRUCTED JURY, AND WHERE THE TRIAL COURT HAS A SUA SPONTE OBLIGATION TO INSURE THAT THE JURY IS PROPERLY INSTRUCTED IN REGARDS TO THE DEFENDANT'S THEORY OF THE CASE, AND WHERE THE DEFENSE WAS THAT OF MISTAKEN IDENTIFICATION, AND THAT THE COMPLAINANTS' IDENTIFICATION TESTIMONY WAS UNRELIABLE, THE FAILURE OF THE TRIAL COURT TO SUA SPONTE GIVE INSTRUCTIONS ON IDENTIFICATION AND IMPEACHMENT BY PRIOR INCONSISTENT STATEMENT DEPRIVED THE DEFENDANT OF A FAIR TRIAL.

III WHERE THE PROSECUTOR IN CLOSING ARGUMENT REPEATEDLY MADE IMPROPER APPEALS TO THE SYMPATHY WHICH THE JURY WOULD NATURALLY FEEL FOR THE COMPLAINING WITNESSES IN THIS CASE, AND IMPROPERLY APPEALED TO THE JURORS TO PUT THEMSELVES IN THE SHOES OF THE COMPLAINING WITNESSES, AND REPEATEDLY MISSTATED THE EVIDENCE AND ARGUED FACTS NOT IN EVIDENCE, PETITIONER TRENTON MILLENDER WAS DENIED A FAIR TRIAL.

IV. AS A RESULT OF THE CUMULATIVE EFFECT OF THE ERRORS IN THIS CASE, THE PETITIONER WAS DENIED THE POSSIBILITY OF A FAIR TRIAL.

## II. Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harpster v. State of Ohio*, 128 F.3d 322, 326 (6th Cir.1997).

 A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than

the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412–413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495.

## III. Discussion

### A. The Ineffective Assistance of Counsel Claims

Petitioner first claims that he was denied the effective assistance of counsel.

### 1. Standard of Review.

 To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[2] In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.; O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir.1994). In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.[3]

2. Petitioner argues that, in addition to establishing prejudice under the *Strickland* test, trial counsel's performance was so deficient as to amount to a constructive denial of representation and entitle Petitioner a presumption of prejudice under the standard from *United States v. Cronic*, 466 U.S. 648, 658–59, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and its progeny. This Court disagrees. In *Cronic* the Supreme Court stated that prejudice may be presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.*

In the present case defense counsel never admitted that his client was guilty. Defense counsel cross-examined eyewitnesses about their prior attempts to identify Petitioner at his in-person lineup and elicited, for example, admissions from Tina Robinson that she identified someone else at the lineup, was told by police after the lineup that she had failed to identify Petitioner, and that she was identifying Petitioner at trial solely by his height. Defense counsel made a final argument which asserted that the state had failed to prove Petitioner's identity as one of the perpetrators beyond a reasonable doubt, as evidenced by the fact that no one had recognized him during the incident, three witnesses failed to identify him at the lineup, and that the perpetrator he was accused of being had been masked throughout the entire crime. This Court concludes that Petitioner has not shown that he was constructively denied counsel such as to entitle him to a presumption of prejudice under *Cronic* and its progeny.

3. In denying Petitioner's ineffective assistance of counsel claims, the Michigan Court of Appeals applied the wrong standard of review, by requiring that Petitioner show that but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different and that the result of the proceeding was fundamentally unfair or unreliable. In the present case, the state court decided Petitioner's ineffective assis-

## 2. The individual claims.

### a. Failure to seek suppression of out-of-court identifications as impermissibly suggestive

Petitioner contends that trial counsel made a serious unprofessional error by failing to file motions to suppress identification testimony and for an evidentiary hearing pursuant to *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) regarding the out-of-court identifications of all of the witnesses who identified Petitioner.

■ In the present case Petitioner fails to show that the in-person lineup identifications made by Jermeka Roach, Lisa Wells, and Eugene Wells were impermissibly suggestive. Petitioner contends that he was by far the tallest subject in the lineup. However, the copy of the photo of the lineup supplied as Petitioner's Exhibit O shows that this was not the case. There were five subjects in the lineup. Petitioner was subject number one, counting from the left. Visual observation of the photo shows that subjects one (Petitioner), two, and three all appear to be about the same height. The photo is of fairly poor quality. It would be difficult to identify someone from this photo because the subjects' features are quite unclear. However, it is quite clear from the photo that subjects one, three, and four all appear to be about the same height. The written records summarizing the lineup, set forth on sheets titled Showup & Identification Record, state that Petitioner was six feet, one inch tall and weighed one-hundred and sixty-five pounds; subject three was six feet tall and weighed one-hundred and sixty pounds, and subject four was six feet tall and weighed one-hundred and seventy pounds. Petitioner claims in his affidavit that he actually was six feet, three inches tall and weighed one-hundred and seventy-five pounds. See Petitioner's Exhibit I at 2. Petitioner may or not be correct about his actual height and weight at the time of the lineup. Subjects three and four may have been slightly taller than six feet. All of the subjects appear to be standing in a relaxed, but upright stance, although postural differences may mask small differences in height. None of the subjects are obviously slouching or bending their knees. Subjects three and four appear somewhat thinner than subject one (Petitioner), although this apparent difference may be due in part to the fact that petitioner was wearing a horizontally striped outfit, while subject three is wearing a vertically striped shirt.[4]

tance claim by applying a wrong rule, much as the Virginia Supreme Court did in *Williams v. Taylor, supra.* However, nowhere does the Supreme Court suggest in *Williams* that the petitioner was entitled to habeas relief simply because the Virginia Supreme Court denied his ineffective assistance claim by applying a wrong rule. Thus, despite finding that the Virginia Supreme Court's decision was contrary to clearly established United States Supreme Court precedent, and finding that it was impossible to determine the extent to which the Virginia Supreme Court's reliance on applying a wrong rule affected its decision that Williams suffered no prejudice, the Supreme Court did not conduct a full de novo review of the petitioner's ineffective assistance of counsel claims under *Strickland.* Rather, the Supreme Court reviewed the petitioner's ineffective assistance claims to determine whether the result reached by the Virginia Supreme Court constituted an unreasonable application of the *Strickland* prejudice test. This Court must therefore review the state court record and analyze Petitioner's ineffective assistance claims applying the *Strickland* prejudice test to determine whether the result reached by the state court that Petitioner was not prejudiced by counsel's alleged errors was reasonable.

4. All of the subjects appear to be dressed in casual clothes. Petitioner's clothing does not appear to be substantially different from that of the other subjects, nor was Petitioner or any of the other subjects dressed in all black clothing similar to the attire the witnesses described the perpetrators as wearing.

■ Great discrepancies in height between a suspect and all of the other subjects in a lineup may render a lineup impermissibly suggestive. *Foster v. California*, 394 U.S. 440, 441, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *United States v. DeBose*, 433 F.2d 916, 917 (6th Cir.1970). However, minor discrepancies in height and weight between the suspect and other subjects do not render a lineup impermissibly suggestive. There is no absolute requirement that other persons in a lineup be nearly identical to the suspect. *See Van Tran v. Lindsey*, 212 F.3d 1143, 1156 (9th Cir.2000). As one court has noted: "A lineup of clones is not required." *United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir.1998). The apparent differences between Petitioner's height and weight and those of two of the other four subjects were minor. This Court concludes that lineup subjects one (Petitioner), three, and four all appear to be of a similar height and weight and that the lineup was not suggestive on this account.

All of the subjects in the lineup appear to have short hair. The subjects' ages were twenty (Petitioner), twenty-two, twenty-four, seventeen, and twenty-three. Petitioner was the only subject with no facial hair. See Petitioner's Exhibit B. However, Petitioner was suspected of being one of the masked perpetrators. It was undisputed that the two masked perpetrators kept their masks on throughout the entire home invasion incident. There is no indication in the record that any of the witnesses stated that lack of a mustache or other facial hair was a distinguishing characteristic which would have caused them to identify only a man without a mustache or other facial hair from the lineup. Therefore, this Court concludes that the lineup was not impermissibly suggestive on account of the subjects' ages, head hair, facial hair, mustaches or lack thereof.

Petitioner contends that his voice lineup identification was impermissibly suggestive because he was by far the tallest subject in the lineup, the witnesses could see the subjects as they gave their voice samples, and the suggestiveness of his allegedly far greater height tainted the lineup identifications which all depended at least in large part on voice identification. This Court has found that the lineup was not suggestive by virtue of the height, weight or other visual characteristics of the subjects. Therefore, Petitioner's claim that the lineup's visual suggestiveness tainted the voice identifications fails.

Petitioner further contends that his lineup was impermissibly suggestive because none of the other four subjects had a voice that sounded at all like his. Petitioner's Exhibit I at 2. Petitioner's Exhibit I is an affidavit signed by Petitioner and dated November 6, 1995. In his affidavit, Petitioner alleges that "none of the other individuals in the lineup had voices that in any way resembled or sounded like mine." *Id.* Petitioner further alleges in the affidavit that "[a]t no time before or during the trial did [defense counsel] Mr. Bailer ever ask me any questions about the manner in which the lineup was conducted, the appearance of the people in the lineup, the manner in which we were required to utter certain sentences, or the sound of the voices of the other men in the lineup." *Id.* Petitioner does not allege that he ever told his trial attorney anything about the appearance of the other men in the lineup, or about their voices. *Id.*

The attorney present at Petitioner's lineup, Alecia Jones, made handwritten observations on the Showup & Photo Identification Record sheets. Attorney Jones noted on each witness's sheet whether he or she made an identification, which subject was identified, if any, and in the case of Eugene Wells, that he stated, "I think it

was # 1." Petitioner's Exhibit B. Attorney Jones noted the names, ages, heights, and weights of the subjects and what phrases they were to say for the different witnesses. Attorney Jones also wrote in a section titled "Description and Remarks" the length of the subjects' hair, a description of their facial hair, if any; and a description of their clothing. Attorney Jones did not write any observations about the subjects' voices.

Three of the six witnesses to the crimes identified Petitioner at his in-person lineup, three did not. Two of the three witnesses who did not identify Petitioner identified someone else. The attorney present at the lineup conscientiously made detailed notes about the lineup, including the phrases uttered by the subjects, but wrote nothing about the sound of the subjects' voices. Petitioner's affidavit asserts that defense counsel did not ask him anything about the lineup, but does not allege that he told counsel anything about the lineup, despite claiming that none of the other subjects' voices resembled or sounded like his voice "in any way" and that he was "obviously the tallest person in the lineup." Exhibit I.

On the basis of the record before it, this Court is not persuaded that Petitioner's in-person lineup voice identification was impermissibly suggestive. The evidence that 1) only three of the six witnesses at the lineup identified Petitioner, 2) Petitioner never complained to his trial attorney about the alleged suggestiveness of the lineup, including the sound of the subjects' voices, 3) the attorney present at the lineup made no notes about the subjects' voices, although she recorded many detailed notes about other matters, 4) the subjects were of similar age, and 5) Petitioner's allegation that he was by far the tallest man at the lineup was shown to be false by the photo of the lineup, belies

Petitioner's claim that the voice lineup was unduly suggestive.

This Court finds that Petitioner's in-person lineup was not impermissibly suggestive by virtue of the appearance of the subjects or the sound of their voices. Therefore, the out-of-court identifications by Jermeka Roach, Lisa Wells, and Eugene Wells were not impermissibly suggestive. As these out-of-court identifications were not impermissibly suggestive, it was not attorney error to fail to seek their suppression on this basis.

**b. Failure to seek suppression of in-court identifications as impermissibly suggestive.**

 Petitioner next contends that trial counsel was ineffective for failing to seek suppression of his in-court identifications. A defendant has the initial burden of proving that the identification procedure was impermissibly suggestive. It is only after a defendant meets this burden that the burden then shifts to the prosecutor to prove that the identification was reliable independent of the suggestive procedure. *English v. Cody,* 241 F.3d 1279, 1282–1283 (10th Cir.2001) (citing to *United States v. Wade,* 388 U.S. 218, 240, n. 31, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)). If a defendant fails to show that a pre-trial identification procedure was impermissibly suggestive, or if the totality of the circumstances indicate that the in-court identification is otherwise reliable, no due process violation has occurred; it is for the jury or factfinder to determine the weight to be given to the identification. *United States v. Hill,* 967 F.2d 226, 230 (6th Cir.1992). This Court has found that petitioner's lineup was not impermissibly suggestive.

Further, testimony by Jermeka Roach, Lisa Wells, and Eugene Wells established that these witnesses identified Petitioner at his in-person lineup after viewing the lineup and hearing the subjects speak and

that they were able to observe Petitioner for a considerable period of time at a close distance during the home invasion. Although Petitioner was masked throughout the incident, the witnesses were able to hear his voice for a considerable period of time, view his height, overall body size, shape, and posture, and see his eyes, nose, and glasses. Petitioner has not shown that his identification procedure was impermissibly suggestive.

■ This Court concludes that there was no basis to seek suppression of the in-court identifications made by Jermeka Roach, Lisa Wells, and Eugene Wells as being based on an impermissibly suggestive pre-trial proceeding. These witnesses identified Petitioner at a non-suggestive in-person lineup held about two weeks after the crime. Because the record in this case establishes that the pre-trial identification procedure was not unduly suggestive, defense counsel did not render ineffective assistance of counsel by failing to move to suppress the in-court identification of petitioner, as there was no need to consider independently the reliability of the in-court identifications. *See United States v. Corcoran,* 855 F.Supp. 1359, 1367–1368 (E.D.N.Y.1994).

■ Petitioner also alleges that counsel was ineffective for failing to seek the suppression of the in-court identification of petitioner by the witnesses who failed to earlier identify him at the lineup. The fact that a witness cannot identify an accused at a pre-trial lineup procedure is not a reason to exclude his or her testimony identifying the accused in court; the failure to identify an accused during a pre-trial lineup goes only to the weight of the witness's identification testimony and not to its admissibility. *United States v. Cau-*

*sey,* 834 F.2d 1277, 1286 (6th Cir.1987).[5] A trial counsel's failure to move to suppress an allegedly unreliable in-court identification is not ineffective assistance, absent a reasonable probability that this motion would have resulted in a decision to exclude the testimony. *See White v. Helling,* 194 F.3d 937, 941–942 (8th Cir.1999). In light of the fact that the failure by these three witnesses to identify petitioner at the pre-trial lineup would not have excluded their in-court identification of him as the perpetrator, counsel was not ineffective for failing to move for its suppression. *White v. Kapture,* 2001 WL 902500, * 9 (E.D.Mich. June 26, 2001). Moreover, defense counsel cross-examined these witnesses about the fact that they had failed to positively identify anyone at the pre-trial lineup. The decision to attack the credibility of these witnesses' identification of petitioner through extensive cross-examination, rather than to object to the in-court identification, was a reasonable trial strategy that defeats petitioner's ineffective assistance of counsel claim. *See Killebrew v. Endicott,* 992 F.2d 660, 665 (7th Cir.1993).

**c. Failure to seek suppression of identifications based solely or largely on voice identification under Michigan state law**

■ Petitioner also argues that trial counsel erred by failing to seek suppression of the out-of-court voice identifications of petitioner made by Jermeka Roach, Lisa Wells, and Eugene Wells and the in-court voice identifications by all of the identifying witnesses under applicable Michigan state law. Petitioner argues that these identifications were voice only or voice-dependent identifications which

---

**5.** Michigan law is in accord on this point. *See People v. Barclay,* 208 Mich.App. 670, 676, 528 N.W.2d 842 (1995).

failed to pass muster under MRE 901(b)(5) and *People v. Bozzi,* 36 Mich.App. 15, 193 N.W.2d 373 (1971), because a sufficient foundation for their admission was not established under state law. MRE 901(b)(5) states that a voice may be identified "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

The Michigan Court of Appeals stated in *Bozzi* that:

> [I]dentification testimony, by voice, as otherwise, must be reasonably positive and certain. Obviously that certainty must be shown to exist in the mind of the identifying witness by testimony that is, in form, positive and unequivocal ... but it must also appear by the existence of some reason to which the witness can attribute his ability to make the voice identification, of which familiarity or peculiarity are the most common example. Modern, scientific voice analysis suggests that there may be others.

*Id.* at 22, 193 N.W.2d 373; *See also People v. Hayes,* 126 Mich.App. 721, 723, 337 N.W.2d 905 (1983).

Unfortunately, there is no Michigan caselaw which addresses the amount of familiarity with a speaker's voice that is required to lay a foundation for admission of testimony concerning the identification of a voice under MRE 901(b)(5). However, a review of several federal court cases which involve an interpretation of FRE 901(b)(5), the identical federal counterpart to MRE 901(b)(5), shows that a sufficient foundation had been established to admit the voice identification testimony of the witnesses in this case. Under FRE 901(b)(5), so long as an identifying witness is "minimally familiar" with the voice that he or she identifies, the foundational requirements of 901(b) are satisfied. *United States v. Plunk,* 153 F.3d 1011, 1023 (9th Cir.1998); *United States v. Degaglia,* 913 F.2d 372, 376 (7th Cir.1990); *United States v. Cerone,* 830 F.2d 938, 949 (8th Cir.1987); *United States v. Cuesta,* 597 F.2d 903, 915 (5th Cir.1979). Attacks on the accuracy of a voice identification go to the weight of the evidence, not its admissibility, and the issue is for the jury to decide. *United States v. Cerone,* 830 F.2d at 949; *United States v. Cuesta,* 597 F.2d at 915.

In the present case, although petitioner was masked throughout the incident, the witnesses were able to hear his voice for a considerable period of time during the commission of the crime. Several federal cases have held that a single contact with a defendant's voice is a sufficient basis to permit the voice identification under (901)(b)(5). *See United States v. Lampton,* 158 F.3d 251, 259 (5th Cir.1998)(hearing speaker's voice on prior personal contact was sufficient basis for F.B.I. agent to identify the speaker's voice on the audiotape of telephone conversation); *Jones v. Toombs,* 16 F.3d 1220, 1993 WL 503083, * 2 (6th Cir. December 7, 1993)(complainant's testimony that the voice of the man who called him on the phone was the same voice as the man who approached him in the hallway of his building was sufficient to permit the witness to identify petitioner as the person who called him on the phone); *United States v. Khorrami,* 895 F.2d 1186, 1194 (7th Cir.1990)(recorded phone conversations properly admitted based in part on testimony of witness who identified defendant's voice after making one call to defendant's residence and comparing voice of person who answered to the voice on tapes). The fact that petitioner's voice was not shown to have any peculiar characteristics and that these witnesses may have only heard petitioner's voice one time went to the weight, not the admissibility, of their testimony. *See United States v. Axselle,* 604 F.2d 1330, 1338 (10th Cir. 1979).

In the present case, petitioner has failed to show that there is a reasonable probability that defense counsel would have been successful in having the voice identifications of petitioner suppressed pursuant to MRE 901(b)(5). Because there is no substantial possibility that the trial court would have suppressed the voice identifications of petitioner under the circumstances of this case, petitioner was not denied the effective assistance of counsel by defense counsel's failure to object to these voice identifications. *See Beachum v. Tansy,* 903 F.2d 1321, 1330 (10th Cir.1990).

**d. Failure to make an opening statement.**

■ Petitioner next contends that trial counsel made an unprofessional error by failing to make an opening statement which reflected counsel's failure to develop and follow a coherent theory of the case. Defense counsel reserved his opening statement until hearing all of the prosecution's evidence. However, the defense ultimately decided not to present any evidence, after Petitioner and defense counsel conferred for several minutes at the close of the prosecution's case. Because Petitioner presented no evidence, the opportunity to present an opening statement was lost.

■ "The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel." *United States v. Rodriguez–Ramirez,* 777 F.2d 454, 457 (9th Cir.1985). Although it may be unusual for a defense counsel to waive opening argument, such a decision is essentially tactical in nature and is not objectively unreasonable. *Huffington v. Nuth,* 140 F.3d 572, 583 (4th Cir.1998)(internal citations omitted); *See also United States v. Haddock,* 12 F.3d 950, 955 (10th Cir.1993)(the failure to pres-

ent an opening statement itself is not ineffective assistance of counsel).

In this case, petitioner has failed to show that counsel's decision not to make an opening statement was not a tactical decision, nor has he shown a reasonable probability of a different outcome had defense counsel, in fact, made an opening statement. Therefore, petitioner has failed to show that his counsel was ineffective for failing to make an opening statement. *See Byrd v. Collins,* 209 F.3d 486, 525–526 (6th Cir.2000).

**e. Defective cross-examination and final argument**

Petitioner contends that counsel was ineffective for failing to engage in longer and more focused cross-examination of the witnesses to the crimes. Specifically, petitioner contends that defense counsel's cross-examination of the witnesses to the home invasion was too short. Petitioner also claims that defense counsel did not cross-examine the victims about the fearful nature of the incident to demonstrate how it may have affected their abilities to remember things that they heard and saw. Lastly, defense counsel did not ask any of the identifying witnesses whether it was possible that he or she had make a mistake in identifying Petitioner as the masked perpetrator called "T–Bone."

■ Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. *Henderson v. Norris,* 118 F.3d 1283, 1287 (8th Cir.1997).

In this case, Jermeka Roach testified on cross-examination that she could not remember telling the police anything about "T–Bone," including anything about whether he was wearing glasses, or whether she had described him to the police. Jermeka Roach also testified on cross that she did not recognize Petitioner and did

not know who he was during the incident. Jermeka Roach testified on cross-examination that she was able to see the perpetrator's eyes and glasses through his ski mask, but that he was masked throughout the incident. These statements were potentially useful in supporting Petitioner's claim of mistaken identity.

Tina Robinson admitted on cross-examination that she did not identify Petitioner at the in-person lineup. She further testified on cross that the perpetrator had been masked throughout the incident, that she had never seen him before, and did not recognize him during the incident. Defense counsel elicited a statement from Tina Robinson that the basis of her in-court identification of Petitioner at his trial was his height. She further stated that she had identified someone other than Petitioner at the lineup and that she had been told after the lineup that she had not identified Petitioner. These admissions were useful in discrediting the identification testimony of Tina Robinson. At six feet one inch or a little taller Petitioner was taller than average, but not extremely or extraordinarily tall. For Tina Robinson to admit that she had identified Petitioner by his height alone was tantamount to admitting that she could not recall what his face looked like (or his voice sounded like) at all.

Corie Robinson testified on cross-examination that he did not recognize any of the men who invaded the house at the time of the incident and that the man who broke his fingers with the pliers was masked throughout the entire incident. Corie Robinson also testified on cross that he picked someone other than Petitioner out of a lineup and that he could not remember whether the police had told him he had picked someone out "who was wrong." Tr. Vol. II at 67. Corie Robinson testified that he had seen Petitioner at Grace Hospital during a visit to Donwell Harris's mother the Sunday before the home invasion. Defense counsel elicited an admission from Corie Robinson that he had not told the police about the hospital visit after the home invasion and did not testify about it at a preliminary exam held for another defendant, because he only remembered the visit months after the home invasion and the preliminary exam. This cross-examination weakened Corie Robinson's identification testimony.

Defense counsel elicited an admission from Lisa Wells that she identified Petitioner as one of the perpetrators by his voice alone. She also admitted that she had never seen him before the incident and that he was masked throughout. Thus, it was established that Lisa Wells's identification depended solely on voice recognition.

On direct examination, Eugene Wells testified that he identified Petitioner at the lineup after hearing him speak. Tr. Vol. II at 109. On cross-examination Eugene Wells testified that he had seen Petitioner at a preliminary examination and that he recognized him by the glasses he was wearing. It was established that Petitioner was not at that preliminary exam. Tr. Vol. III at 56. Further, by getting Eugene Wells to state that he recognized Petitioner by his glasses, defense counsel raised a significant question of how positive his identification was.

Petitioner contends that defense counsel was ineffective for failing to bring out that Eugene Wells had said "I think it was number one" when he identified Petitioner at the in-person lineup by his voice. It would be improper second-guessing to conclude that failing to ask this question was necessarily attorney error. The use of the expression "I think" is inherently ambiguous, particularly here where the witness was twelve years old. Challenging or questioning the use of this expression on

cross-examination could easily have resulted in the witness responding (on cross or redirect) that he was very certain of his observation, but had said "I think it's number one" because he always said that when giving his opinions, beliefs, or observations. In the present case this Court does not agree that failing to pursue this inquiry was necessarily attorney error.

Damon Brown identified Petitioner at his trial as the man who had hit him on the head with a handgun several times in the bedroom and in the bathroom and whom another perpetrator had referred to as "T–Bone." Tr. Vol. II at 116, 119. Defense counsel elicited testimony on cross-examination from Brown that he did not recognize the masked man who struck him during the incident and that he had not identified Petitioner as one of the perpetrators at either of the two lineups he observed. Tr. Vol. II at 122–23. These admissions weakened Brown's in-court trial identification of Petitioner.

■ Where, as here, trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim. *Cardwell v. Netherland*, 971 F.Supp. 997, 1019 (E.D.Va.1997). Simply put, impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available. *Johnson v. Hofbauer*, 159 F.Supp.2d 582, 607 (E.D.Mich.2001)(internal citations omitted).

■ In the present case, defense counsel's performance did not constitute ineffective assistance of counsel where the record shows that defense counsel carefully cross-examined the prosecution witnesses and in his closing argument emphasized the inconsistencies and weaknesses in the testimony of the various witnesses. *See Krist v. Foltz*, 804 F.2d 944, 948–949 (6th Cir.1986). In reviewing the trial court record, this Court concludes that petitioner's trial attorney adequately cross-examined the witnesses.

■ Petitioner also claims that defense counsel's closing argument was deficient. Petitioner first claims that defense counsel was ineffective for contending in his final statement that there had been four, five, or six perpetrators inside the home, when all of the witnesses testified that only three perpetrators were involved in the crime. Petitioner also claims that defense counsel was ineffective by suggesting in his final statement that the masked intruder identified as petitioner might really have been Donwell Harris. Harris was Elizabeth Wade's grandson and a cousin of Lisa and Eugene Wells and Jermeka Roach.

■ In evaluating an ineffective assistance of counsel claim based on an attorney's summation, a court is required to assess the effectiveness of the summation as a whole. *United States v. Salameh*, 54 F.Supp.2d 236, 255 (S.D.N.Y.1999); *aff'd*, 16 Fed.Appx. 73 (2nd Cir.2001). A closing argument cannot be deficient in a manner sufficient to support a claim of ineffective assistance of counsel unless the theory of the case and the method of implementing the theory of the case were unreasonable under the circumstances. *United States v. Ciancaglini*, 945 F.Supp. 813, 825 (E.D.Pa. 1996).

With respect to counsel's argument involving the number of perpetrators in the house at the time of the crime, counsel was referring to the testimony of Officer Randy Miller of the Detroit Police Department, who responded to the home invasion call on Meyers Street on July 12, 1994. Miller indicated that he had been told that

four to six perpetrators had been involved in the home invasion, robbery, and sexual assaults. Tr. Vol. III, pp. 31–32. The conflict between the number of perpetrators that the witnesses testified to in court and the number that the police had been told were involved was clearly relevant to the credibility of the witnesses and their ability to accurately identify the persons involved in this crime. Therefore, counsel was not ineffective for making this argument. Likewise, counsel was not ineffective for suggesting Donwell Harris's possible involvement in this crime, particularly where there was evidence that Harris had been arrested by the police after this crime. In addition to mentioning these points, counsel also argued that none of the witnesses identified petitioner at the preliminary examination and also argued extensively about the fact that three of the witnesses were unable to identify petitioner at the lineup. Counsel emphasized that at least one witness positively identified another participant in the lineup as being the perpetrator. Counsel also brought up the fact that the police informed this witness that she had identified the wrong person. Counsel further argued that none of the witnesses initially told the police that they believed that petitioner was a suspect to this crime. Counsel also pointed out that the police recovered no evidence from the search of Brian Maxwell's home that could be linked to petitioner. Tr. Vol. III, pp. 48–55.

When viewing the summation as a whole, this Court concludes that the theory of the case, namely, misidentification, and the method of implementing the theory of the case by counsel in the closing argument, was not unreasonable under the circumstances. In the absence of the identification of any particular line of argumentation that might have changed the outcome of this case, petitioner has failed to establish that counsel's closing argument amounted to the ineffective assistance of counsel. *Procter v. Butler*, 831 F.2d 1251, 1256 (5th Cir.1987).

**f. Failure to request identification and impeachment by prior inconsistent statement jury instructions**

Petitioner contends that trial counsel was ineffective for failing to request that the jury be given Michigan's standard jury instructions concerning Identification, CJI 2d 7.8 and Impeachment by a Prior Inconsistent Statement, CJI 2d 4.5 and failing to object when these instructions were not given.

The Michigan Court of Appeals did not specifically address this ground of Petitioner's ineffective assistance of counsel claim. The Michigan Court of Appeals found that Petitioner procedurally defaulted his direct attack on the jury instructions, stating that "[w]hile we believe it would have been better if the court had given the identification and impeachment by prior inconsistent statement instructions, we do not find that the failure to give these instructions resulted in a manifest injustice and we are further satisfied that the instructions that were given adequately presented the issues to be tried and sufficiently protected defendant's rights." *People v. Millender*, Michigan Court of Appeals Docket No. 186524 at 3.

The trial judge gave the following general instructions related to identification:

Now as I have said before, it is your job to decide what the facts of the case are. You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness said. You are free to believe all, none, or part of any person's testimony. In deciding which testimony to believe, you should again rely on your own common sense and everyday experience. There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these ques-

tions. *Was the witness able to see or hear clearly. How long was the witness watching or listening. Was anything else going on that might have distracted the witness.* Did the witness seem to have a good memory. How did the witness look and act while testifying.

Tr. Vol. III at 64 (emphasis added).

The trial court also instructed the jury that petitioner was presumed innocent and that the prosecutor had the burden of proving guilt beyond a reasonable doubt. *Id.* at p. 61.

 Failure to request jury instructions for which there is an evidentiary basis may constitute ineffective assistance of counsel warranting collateral relief when this failure inadvertently loses the defendant's only defense which had a strong likelihood of success. *United States v. Span,* 75 F.3d 1383, 1388–90 (9th Cir.1996). However, failure to request additional instructions is not ineffective assistance when the evidence, the general instruction given, and counsel's closing argument, including his examples and stress on common sense, put the issue squarely before the jury. *Weighall v. Middle,* 215 F.3d 1058, 1063 (9th Cir.2000).

 In the present case, defense counsel's failure to request an instruction on identification or misidentification was not ineffective assistance of counsel, where counsel cross-examined the witnesses about the weaknesses of their identification of petitioner and raised the defense of misidentification in his closing argument to the jury. *See United States v. Pagan,* 829 F.Supp. 88, 93 (S.D.N.Y.1993); *See also Player v. Berry,* 785 F.Supp. 339, 345–346 (E.D.N.Y.1992)(defense counsel's failure to request an expanded identification charge and to object to the charges that were

given was not ineffective assistance, where counsel cross-examined the prosecution witnesses, attempted to weaken the identification of one of the witnesses by suggesting that the witness could have been mistaken, and made a closing address to the jury).

With respect to petitioner's claim that counsel was ineffective for failing to request an instruction on the use of prior inconsistent statements for impeachment purposes, petitioner is unable to show how he was prejudiced by this failure. Had this instruction been given, the jury would have been advised that they could only use the witnesses' prior inconsistent statements for impeachment purposes, and not as substantive evidence. Hence, counsel was not ineffective for failing to request an instruction on impeachment of a witness by prior inconsistent statements, where the instruction would have actually precluded the jury from considering the witnesses' prior inconsistent statements as substantive evidence. *Daniels v. State,* 751 S.W.2d 399, 403 (Mo.App. S.D.1988).[6]

**g. Failure to object to alleged prosecutorial misconduct**

Petitioner contends that trial counsel was incompetent for failing to object to alleged prosecutorial misconduct during final argument. Petitioner also raises a prosecutorial misconduct claim as an independent habeas claim (Claim III). For purposes of judicial economy, the Court will consider the substantive prosecutorial misconduct claim along with this part of petitioner's ineffective assistance of counsel claim.

 When a petitioner seeking habeas relief makes a claim of prosecutorial misconduct, the reviewing court must consider that the touchstone of due process is

---

**6.** When there is paucity of federal law on a subject, state decisions interpreting the Federal Constitution, while not binding on a federal court, are persuasive. *See Alvarez v. Straub,* 64 F.Supp.2d 686, 698 fn. 5 (E.D.Mich. 1999).

the fairness of the trial, not the culpability of the prosecutor. On habeas review, a court's role is to determine whether the conduct was so egregious as to render the entire trial fundamentally unfair. *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1355–1356 (6th Cir.1993). Because this case is a habeas case and is not a direct appeal, the inquiry into this issue is less stringent. *Spalla v. Foltz*, 615 F.Supp. 224, 227 (E.D.Mich.1985). When analyzing a claim of prosecutorial misconduct, a court must initially decide whether the challenged statements were improper. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir.2000). If the conduct is improper, the district court must then examine whether the statements or remarks are so flagrant as to constitute a denial of due process and warrant granting a writ. *Id.* In evaluating prosecutorial misconduct in a habeas case, consideration should be given to the degree to which the challenged remarks had a tendency to mislead the jury and to prejudice the accused, whether they were isolated or extensive, whether they were deliberately or accidentally placed before the jury, and, except in the sentencing phase of a capital murder case, the strength of the competent proof against the accused. *Serra*, 4 F.3d at 1355–1356.

■ Petitioner first contends that the prosecutor improperly appealed to the sympathies of the jury by devoting a significant portion of his final argument to summarizing the way the crimes were committed and by asking the jury to put themselves in the position of the victims. Specifically, petitioner claims that the prosecutor appealed to the sympathies of the jury by asking the jurors to see pictures of the victims' injuries and asking them to imagine what Corie Robinson went through having his fingers broken, being struck after stating he liked gospel music, and being told that his sister would be killed first since he stated he loved her more than his girlfriend. This was not improper argument because recounting these factual allegations did not only appeal to the jury's sympathies. Summarizing the nature of the crimes committed and the circumstances of their commission also served to educate the jury as to why some of the victims were able to identify Petitioner as one of the perpetrators and some were not. Further, by summarizing the totality of the crimes committed by Petitioner and in his presence, the prosecutor sought to show that Petitioner was guilty of these crimes as either a principal or an aider and abettor. To the extent that the prosecutor's depiction of the crimes served to educate the jury about the difficulties faced by the victims as witnesses and about the culpability of Petitioner as either a principal or an aider and abettor his argument was not improper.

■ The prosecutor asked the jury to view the situation from the victims' perspectives on several occasions. It is not improper to ask the jury to put itself in the place of a witness to a crime as a means of asking the jury to mentally reconstruct the crime scene and situation in order to understand the strengths and weaknesses of witnesses' testimony. *United States v. Kirvan*, 997 F.2d 963, 964 (1st Cir.1993). In the present case, the victims were witnesses to the criminal episode. They were the only witnesses present during the criminal episode and the only witnesses who could possibly identify the assailants. The prosecutor asked the jury to put itself in the position of the victims in order to understand why only three of the six victims were able to identify Petitioner at his in-person lineup and why the witnesses' descriptions of the perpetrators were not detailed. This was not improper argument.

Moreover, even if the prosecutor's appeals to the jury's emotions or sympathies was improper, this would be insufficient to render the trial fundamentally unfair,

since it was likely that the nature of the crime itself would have produced juror sympathy before the prosecutor made any of these comments. *Walker v. Gibson*, 228 F.3d 1217, 1243 (10th Cir.2000). Finally, petitioner's claim would also be defeated by the fact that the trial court instructed the jury that they were not to let sympathy or prejudice influence their decision. *Welch v. Burke*, 49 F.Supp.2d 992, 1006 (E.D.Mich.1999).[7]

■■■■ Petitioner next argues that it was attorney error to fail to object to certain misstatements of fact by the prosecutor. On one occasion the prosecutor stated that "victims" had seen Petitioner at Grace Hospital. Tr. Vol. III at 40. Actually, there was evidence only that Corie Robinson had seen Petitioner at Grace Hospital on the visit to Donwell Harris's mother. The prosecutor explicitly stated two times during his final argument that it was Corie Robinson who had seen Petitioner at Grace Hospital. Tr. Vol. III at 42, 46. A prosecutor's statement in closing argument is improper if the statement argues facts which are not in evidence and are prejudicial. *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir.1995). The prosecutor's remark that "victims" had seen Petitioner at Grace Hospital was corrected by his two statements made only minutes later that it was Corie Robinson who had seen Petitioner at Grace Hospital. Taken as a whole, the prosecutor's argument did not argue facts not in evidence.

■■■■ Lastly, petitioner contends that the prosecutor committed flagrant misconduct when he concluded his rebuttal argument by stating: "So all this, you know, shenanigans is kind of like what happened at this crime. Okay. Trenton Millender and Ericke Peterson being cowards, they had to put on ski masks and terrorize little kids and women. Were hiding. And now

they're trying to pool [sic] the wool over your eyes to hide from justice, and that should not happen. Should not happen. Thank you for your attention." Tr. Vol. III at 59–60.

In the present case, even if the prosecutor's remark that either petitioner or his defense counsel was trying to pull "the wool" over the jury's eyes was improper, the isolated remark was not so egregious as to warrant reversal. *See United States v. Resto*, 824 F.2d 210, 212 (2nd Cir.1987). The remark was relatively isolated, was not extensive, and was only a small part of a closing argument that focused heavily on summarizing the evidence presented at trial. *Byrd v. Collins*, 209 F.3d at 532. When combined with the court's instruction that the closing arguments were not evidence,[8] the prosecutor's isolated comment did not render the entire trial fundamentally unfair. *Id.* at 533.

Petitioner has failed to show that he was deprived of a fair trial because of prosecutorial misconduct. Petitioner's prosecutorial misconduct claim is without merit. Because this Court concludes that the prosecutor's remarks in closing argument did not prejudice petitioner so as to deprive him of a fair trial, petitioner's claim that counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's remarks must also be rejected. *United States v. Nwankwo*, 2 F.Supp.2d 765, 770 (D.Md.1998); *See also White v. Withrow*, 2001 WL 902624, * 12 (E.D.Mich. June 22, 2001).

**h. Failure to call defense witnesses to establish that Petitioner could not have been at Grace Hospital with Corie Robinson on July 10, 1994, the day before the criminal episode**

■■■■ Petitioner contends that trial counsel was ineffective for failing to call

---

7. *See* Tr. Vol. III, p. 60.

8. Tr. Vol. III, p. 62.

witnesses who could have established that Petitioner was in Tennessee or on his way back from Tennessee on Sunday, July 10, 1994 and therefore could not have gone to Grace Hospital that day. Sunday, July 10, 1994 was the day before the criminal episode and the day Petitioner contends Corie Robinson was referring to when he testified he had seen Petitioner at Grace Hospital "the Sunday before" the criminal episode. Petitioner contends it was attorney error to fail to call these witnesses to attack Corie Robinson's credibility. This Court is not persuaded that failing to call these witnesses was attorney error for several reasons.

First, it is not certain that Corie Robinson meant Sunday, July 10, 1994, when he said he saw Petitioner at Grace Hospital the Sunday before the home invasion which occurred on a Monday. Robinson may have meant Sunday, July 3, 1994. Second, Corie Robinson may simply have been mistaken about when the visit to Grace Hospital took place. Whether Corie Robinson was correct about the day of the visit to Grace Hospital is of little importance. Of greater importance is whether Petitioner and Corie Robinson ever went together to Grace Hospital to visit Donwell Harris's mother.

Petitioner's affidavit does not state that he never visited Grace Hospital and/or Donwell Harris's mother, with or without Corie Robinson. It only states that he did not visit Grace Hospital on July 10, 1994. Corie Robinson may simply have been wrong about the day and/or date. Showing that Corie Robinson was wrong about whether the visit took place on July 10, 1994, would have achieved little, if anything, to undercut his credibility, particularly since Donwell Harris also testified that Petitioner went with him to visit his mother at Grace Hospital.

Finally, and most important, calling a parade of witnesses who knew where Petitioner was the day before the criminal episode would not have exculpated petitioner of this crime. None of these witnesses' affidavits claim to know where Petitioner was the next day, Monday, July 11, 1994, when the criminal episode occurred. Calling some or all of these witnesses to testify about July 10, 1994, would have allowed the prosecutor to point out in argument that none of them had anything to say about July 11, 1994, the very next day. This might have done more harm to Petitioner than any resultant challenge to Corie Robinson's credibility would have done good.

■■■ A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant. *Marra v. Larkins,* 111 F.Supp.2d 575, 585, fn. 13 (E.D.Pa.2000). For the above stated reasons, this Court is not persuaded that trial counsel's decision not to call the witnesses who might have established that Petitioner had not visited Grace Hospital with Corie Robinson on July 10, 1994 was attorney error, since none of these witnesses would have exculpated petitioner of the crimes that he was charged with.

**i. Failure to object to admission of a pair of pliers, a handgun, and a shotgun**

■■■ Petitioner contends that it was attorney error to fail to object to the admission of a pair of pliers, a handgun, and a shotgun which were not proven to be used during the criminal episode. It was undisputed that Corie Robinson and Jermeka Roach were assaulted with a pair of pliers by one of the perpetrators. It was also undisputed that the two masked intruders were armed with handguns and the unmasked intruder, identified as Brian Maxwell, was armed with a long gun. The shotgun admitted at trial was found at Ericke Peterson's house. The 9 mm hand-

gun admitted at trial was found at Brian Maxwell's house. The pliers admitted in evidence were found at the crime scene, although Corie Robinson testified that his fingers had been broken with pliers having a different colored handle. None of these objects tied Petitioner to the crimes, as none of them were found in his possession and none of them bore his fingerprints. Consequently, this Court is not persuaded that it was attorney error to refrain from objecting to their admission.

### 3. Conclusion

Petitioner has failed to establish that he was deprived of the effective assistance of counsel.

### B. Jury instructions claim

In his second claim, petitioner contends he was denied due process of law when the trial court failed to give the jury the identification instruction, CJI2d 7.8, and the impeachment by prior inconsistent statement instruction, CJI2d 4.5. As mentioned above, petitioner's claim was procedurally defaulted, because of the fact that his defense counsel failed to request that these jury instructions be given to the jury.

▮▮▮ When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice". *Coleman v. Thompson*, 501 U.S. 722, 750–751, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). If petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).

▮▮▮ In this case, the Michigan Court of Appeals clearly indicated that by failing to request these jury instructions at trial, petitioner had not preserved this issue. The Michigan Court of Appeals' limited review of the unobjected to error for manifest injustice does not constitute a waiver of the procedural default by the State of Michigan. *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir.1989).

▮▮▮ To establish cause to excuse a procedural default, a petitioner must present a substantial reason to excuse his procedural default. This generally requires the petitioner to "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Ineffective assistance of counsel is cause for a procedural default. *Id.* However, attorney error that falls short of constitutional ineffective assistance of counsel does not constitute "cause" for a procedural default. *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir.1994).

▮▮▮ This Court has already held that petitioner has failed to show that counsel was ineffective for failing to request instructions on identification and the use of prior inconsistent statements for impeachment. Petitioner has therefore failed to show cause for this procedural default. Therefore, he has waived this claim for purposes of habeas review.

▮▮▮ Further, even if Petitioner could show cause for his procedural default, the jury instructions as given did not by themselves deprive Petitioner of a fair trial. The Supreme Court has stated that "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction, when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52

L.Ed.2d 203 (1977). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal. The question in such a collateral proceeding is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned", and an omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law. *Id.* at 154–155, 97 S.Ct. 1730. The challenged instruction must not judged in isolation but must be considered in the context of the entire jury charge. *Jones v. United States*, 527 U.S. 373, 391, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). To warrant habeas relief, the jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir.2000). A habeas petitioner's burden of showing prejudice is especially heavy when a petitioner claims that a jury instruction was incomplete, because an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. *Fama v. Commissioner of Correctional Services*, 69 F.Supp.2d 388, 397 (E.D.N.Y.1999).

In the present case Petitioner asserts that the instructions given did not adequately guide the jury in its consideration of the reliability of his identification and the credibility of the identifying witnesses. This is not a case were a challenged instruction added an additional element to the defendant's burden of establishing his or her defense as in *Barker v. Yukins*, 199 F.3d 867, 875–76 (6th Cir.1999)(failure to give required instruction that use of lethal force to resist an imminent rape would be

lawful self-defense). Nor is this a case where the challenged instructions could be reasonably construed as impermissibly shifting the burden of proof of an element of the crime to the defendant, *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), or could reasonably have resulted in requiring establishment of a higher degree of doubt than a reasonable doubt for acquittal. *See Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).

 In the present case, the jury instructions as given instructed the jury to consider whether the witnesses were able to see or hear clearly, how long the witnesses were watching or listening, and whether the witnesses may have been distracted while observing the events in question. Petitioner has not shown that these instructions by themselves violated due process of law. Accordingly, this Court concludes that Petitioner's claim that the trial court should have sua sponte given Michigan's standard jury instructions on identification and impeachment by a prior inconsistent statement and that the jury instructions as given deprived him of a fair trial does not entitle him to habeas relief. Consequently, this claim is denied as an independent basis for habeas relief.

### C. Cumulative error claim

 Lastly, Petitioner contends that cumulative error entitles him to habeas relief. A cumulative error analysis is appropriate where there are certain errors which, while considered alone might not deprive petitioner of due process, may cumulatively produce a trial that is fundamentally unfair. *United States v. Mays*, 69 F.3d 116, 123 (6th Cir.1995); *See also Shacks v. Tessmer*, 9 Fed.Appx. 344, 355 (6th Cir.2001); *cert. den.* 122 S.Ct. 289 (2001). However, meritless claims or claims that are not prejudicial cannot be cumulat-

ed, regardless of the total number raised. *Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir.1996). In light of the fact that this Court has already determined that petitioner's individual claims are either without merit or that the errors complained of did not prejudice the defense in this case, petitioner's cumulative error claim must also be rejected.

## IV. CONCLUSION

■■■■ The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel,* 529 U.S. 473, 483–484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484, 120 S.Ct. 1595. A district court has the power to deny a certificate of appealability *sua sponte. Allen v. Stovall,* 156 F.Supp.2d 791, 798 (E.D.Mich.2001).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right.

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**