Germain **SKINNER**, Petitioner,

v.

Barry **McLEMORE**, Respondent.

No. 06–12350.

United States District Court,
E.D. Michigan,
Southern Division.

March 7, 2008.

Germain Skinner, Baraga, MI, pro se.

Brad H. Beaver, B. Eric Restuccia, Michigan Department of Attorney General, Lansing, MI, for Respondent.

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION; GRANTING MOTION TO EXPAND THE RECORD

ARTHUR J. TARNOW, District Judge.

Before the Court is Magistrate Judge Komives' Report and Recommendation [Docket # 58] filed August 13, 2007. The Magistrate Judge recommends that this Court deny petitioner's application for the writ of habeas corpus. Petitioner filed objections on August 30, 2007 and amended objections on October 10, 2007.

Having reviewed the file, the Report and Recommendation and the objections the Court **ADOPTS** the Report and Recommendation as the findings and conclusions of the Court. Accordingly, petitioner's application for the writ of habeas corpus is **DENIED.**

IT IS FURTHER ORDERED that the petitioner's motion for expansion [Docket # 64] of the record is **GRANTED.**

### REPORT AND RECOMMENDATION

PAUL J. KOMIVES, United States Magistrate Judge.

*Table of Contents*

I. *RECOMMENDATION* ............................................... 630

II. *REPORT* ......................................................... 630
 A. *Procedural History* ................................................ 630
 B. *Factual Background Underlying Petitioner's Conviction* ................... 631
 C. *Procedural Default* ............................................... 638
 D. *Standard of Review* .............................................. 641

E. *Prosecutorial Misconduct (Claims I & II)* .............................. 642
 1. *Clearly Established Law* ........................................... 642
 2. *Analysis* ........................................................ 643
 a. Argument Regarding DNA Testing .............................. 643
 b. Comment on Invocation of Right to Remain Silent .................. 646
 c. Personal Opinion of Witness Credibility .......................... 648
F. *Amendment of Charges* ............................................ 650
 1. *Clearly Established Law* ........................................... 650
 2. *Analysis* ........................................................ 651
G. *Conclusion* ..................................................... 651

III. *NOTICE TO PARTIES REGARDING OBJECTIONS* ......................... 651

\* \* \* \* \*

I. *RECOMMENDATION*: The Court should deny petitioner's application for the writ of habeas corpus.

II. *REPORT*:

A. *Procedural History*

1. Petitioner Germain Skinner is a state prisoner, currently confined at the Baraga Maximum Correctional Facility in Baraga, Michigan.

2. On July 26, 2001, petitioner was convicted of first degree criminal sexual conduct (CSC–I), MICH. COMP. LAWS § 750.520b; second degree criminal sexual conduct, MICH. COMP. LAWS § 750.520c (CSC–II); and first degree home invasion, MICH. COMP. LAWS § 750.110a, following a jury trial in the Genesee County Circuit Court. On August 27, 2001, he was sentenced as an habitual offender, third offense to a term of 40–60 years' imprisonment on the CSC–I conviction, a concurrent term of 15–30 years' imprisonment on the CSC–II conviction, and a concurrent term of 20–40 years' imprisonment on the home invasion conviction.

3. Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I. DEFENDANT CONTENDS THAT HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO MOVE FOR MISTRIAL AFTER THE OFFICER–IN–CHARGE TESTIFIED ON DIRECT EXAMINATION THAT HE HAD NOT SUPPLIED THE DEFENSE WITH EXCULPATORY DISCOVERY MATERIALS BECAUSE "THERE WAS NO EVIDENCE TO SUPPORT [THE CLAIM] THAT MR. SKINNER IS NOT THE PERSON RESPONSIBLE FOR THIS CRIME."

II. DEFENDANT CONTENDS THAT HE WAS DENIED A FAIR TRIAL WHEN THE ASSISTANT PROSECUTOR FAILED TO DISQUALIFY HIMSELF FROM THE PROSECUTION OF THIS MATTER. DEFENDANT ARGUES THAT THE ASSISTANT PROSECUTOR WAS DISQUALIFIED BECAUSE HE WAS ENDORSED AS A WITNESS.

III. DEFENDANT CONTENDS THAT HE WAS DENIED A FAIR TRIAL WHEN THE ASSISTANT PROSECUTOR DENIGRATED DEFENSE COUNSEL IN ARGUMENTS BEFORE THE JURY.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Skinner,* No. 236876, 2003 WL 22715778 (Mich.Ct. App. Nov.18, 2003) (per curiam).

4. Petitioner, proceeding *pro se*, sought leave to appeal these three issues to the Michigan Supreme Court. Petitioner also raised two additional issues: (1) denial of petitioner's Fifth Amendment privilege by the prosecutor's comments on petitioner's failure to explain where he was at the time of the crime and (2) denial of a fair trial by the prosecutor's invasion of attorney-work product and false comment on that work-product. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Skinner,* 470 Mich. 884, 682 N.W.2d 95 (2004).

5. On November 8, 2004, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500–.508, raising the following claims:

I. THE PROSECUTOR DENIED DEFENDANT–APPELLANT A FAIR TRIAL DURING CLOSING AND REBUTTAL ARGUMENT [A.] BY HIS DRASTIC INFRINGEMENT UPON THE STATUTES UNIFORM ACT TO SECURE WITNESS–PRIVILEGE.

B. AND INTRODUCING REPEATEDLY COMMENTS UPON THE DEFENDANT'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT.

C. AND INTRODUCING FALSE EVIDENCE TO THE JURY DURING HIS CLOSING AND REBUTTAL ARGUMENT.

D. AND BY EXPRESSING HIS PERSONAL OPINION ON CREDIBILITY OF WITNESS IN CLOSING AND REBUTTAL ARGUMENT.

II. THE TRIAL COURT DENIED DEFENDANT–APPELLANT A FAIR AND IMPARTIAL TRIAL BY ALLOWING THE PROSECUTOR TO EXCEED PROPER BOUNDS OF ARGUMENT WITHOUT INTERRUPTING TO CORRECT PROSECUTOR.

III. WHETHER THE TRIAL COURT ABUSE[D] ITS DISCRETION AND VIOLATED STATE AND FEDERAL DUE PROCESS BECAUSE THE COURT ADMITTED UNRELATED COUNT TO THE FORMAL CHARGING DOCUMENT.

On February 9, 2005, the trial court denied petitioner's motion for relief from judgment based on the court's conclusion that the claims had been raised in petitioner's direct appeal, and thus were barred by MICH. CT. R. 6.508(D)(2). *See People v. Skinner,* No. 98–3756–FC (Genesee County, Mich., Cir. Ct. Feb. 9, 2005). The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Skinner,* 474 Mich. 1093, 711 N.W.2d 57 (2006); *People v. Skinner,* No. 262165 (Mich.Ct.App. Oct. 21, 2005).

6. Petitioner, proceeding *pro se,* filed the instant application for a writ of habeas corpus on May 25, 2006. As grounds for the writ of habeas corpus, he raises the three claims that he raised in his motion for relief from judgment.

7. Respondent filed his answer on October 31, 2006. He contends that petitioner's claims are barred by petitioner's procedural default in the state courts.

B. *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from his breaking into a home during the night and sexually assaulting an 11–year–old girl. The evidence adduced at trial was accurately summarized in petitioner's brief in

the Michigan Court of Appeals on direct appeal:

The incident was alleged to have occurred in the early morning hours of August 6, 1998. At that time, defendant was staying with girlfriend Juanita Nelson at her apartment in Flint and kept some, but not all, of his clothing there (III 130, 136). On August 5, 1998, defendant left the apartment between 10:00 p.m. and 11:00 p.m. wearing a white tank top and the next time Nelson saw him was 6:00 a.m. the following morning, when they watched television and fell asleep for an unknown period of time (III 131–133, 141, 143). Sometime between 2:00 a.m. and 3:00 a.m., she received a telephone call from defendant, who was calling from his sister's house (III 132–133). Nelson testified that defendant did not own any silk shorts, but he did own blue nylon ones (III 134).

At the time of trial, complainant Laura Williams was 14 years old, but at the time of the alleged incident, she was 11 years old and lived with her parents and two brothers (II, 176, 177; III 105; V 14). She went to sleep between 10:30 p.m. and 11:00 p.m. after watching some television, and the next thing she knew, someone, standing over her about a foot away with his shorts pulled down around his knees, woke her up by shaking her arm (II, 178, 180, 196; III 29). She looked at her clock and noticed that it was 3:30 a.m. (II 214–215). Since Laura did not know who woke her up, she tried to run out of her room and scream, but the man stopped her by putting his hand over her mouth when she reached the end of her bed (II, 179, 186–187). Laura could not breath while the man had his hand over her mouth (II 187–188). The man told her that if she screamed, he would kill her (II 188). She saw his face, because her room was lit by the television and a night light on her clock, and described it as long and narrow (II 185). The man had a gap in his two front teeth and really short hair and a small 2½-inch ponytail at the nape of his neck (II 185–186).

The man told Laura to pull up her shirt and take down her underwear, she did what she was told because she was scared that the man would kill her (II 190). The man next told her to spread her legs, but she could not do so because her underwear was around her ankles, so the man told her to take her underwear off (II 190). The man, who was wearing blue silky shorts and a white tank top, had pulled his shorts down and laid on top of her (II 190–19 1). Laura looked towards the wall because she did not want to look at him (II 191, 194). The man laid there "for a minute or two" and then started rubbing the outer part of her private area (II, 191, 194, 195). Laura was not sure what defendant used, except to say that it was either his hand or his penis (II 191). Laura was not sure how long this lasted, but it seemed to her to be a long time (II 195).

The man got off of her and stood in front of her, told Laura to sit on the side of the bed and told her to touch his penis (II 195, 196, 201). She took his penis in her hand (II 201). The man then told Laura to put his penis into her mouth, and she did so because he said he would leave if she did (II 201–202). After about five or ten seconds, white, nasty tasting stuff came out (II 203, 204). Some of it dripped on her right leg and on her comforter (II 204). The man took her quilt, wiped both her leg and himself off, and left through her window by climbing on top of her book shelf and jumping out (II 205, 206). She glanced at her clock and noticed that it

was 3:47 a.m. (II 215). As he was leaving, the man told Laura that if she told anyone, he would kill her and her entire family (II 207). Laura had an air conditioning unit in the window, but it had been pushed sideways (II 205–206).

Laura waited until she heard the back yard gate shut, then she went to the bathroom to spit the white stuff out (II 206–207). She went into her mother's room because she was scared to go back into her own room and could not sleep (II 207–208). The next morning, when her mother woke her up to go to camp, she told her mother that she did not want to go because "[m]y stomach hurts because there was somebody in my room doing stuff that I didn't want him to do to me." (II, 208). Laura's mother "jumped up," yelled "[w]hat?" and "ran" to call police (II 208, 235). Police were dispatched to the Williams home at 8:17 a.m. and arrived eight minutes later (III 189, 220).

Vicki Williams, Laura's mother, was not sure when she returned to the family home from work or what she did when she returned home on August 5, 1998, but she habitually checked on the children, watched television and went to bed (V 19, 23). On August 5, 1998, she went to her bedroom to find her son Kyle already asleep in the bed with the television on (V 19). She awoke the next morning to find Laura in bed with her and when she told Laura that she was late for camp, Laura calmly told her that she did not feel good and that there had been a man in her room (V 27, 29, 49). Vicki "jumped" out of bed and "ran" down the hall to Laura's room, opened the door, looked in and saw that the window air conditioner had been turned sideways and that the cable box had fallen (V 30, 48, 97). Vicki yelled at her husband and called the police (V 30).

She later took Laura to the hospital (V 32).

Larry Williams, Laura's father, described the family home as a 1,400 square foot ranch with three bedrooms and one bathroom (II 60). At the time of the incident, there were two window-style air conditioner units in the house, one in the living room and one in Laura's room (II 64). The unit in Laura's window had not been properly installed (II 132). Instead, it was "stuck" in the window and was not bolted or secured because the house had vinyl windows (II 64, 132). Since the unit was not custom made for the window, it was secured by two wooden boards on each side and towels "shoved" into a bottom gap (II 64, 147). Larry remembered that August 6, 1998 was cool and the air conditioners were not running (II 69, 126, 156).

Larry returned home from work between midnight and 1:00 a.m. (II 69). After using his key to get into the house, he re-locked the door (II 70, 154). Once he got home, he usually ate leftovers from dinner and watched television on the living room couch (II 72, 74, 77). He also checked to make sure his children were all home (II 73–76). He fell asleep watching television (II 77). He woke up at 6:00 a.m. or 7:00 a.m. to the sound of his wife running through the house, saying someone had been in Laura's room (II 78, 79). He went to Laura's room and saw that the air conditioner unit was off to one side of the window and that the wooden boards and towels were on the floor (II 79, 87, 147). He estimated that there was a two-foot gap between the air conditioner and the side of the window (II 96). After seeing this, he called police (II 96).

After police arrived, Larry went outside and noticed that the gate to his back yard was open, but acknowledged

that his children sometimes left the gate open and that he could not say for sure that the gate was closed before the alleged incident (II 98, 148). Looking for foot prints, he also noticed that it looked like someone had walked on the grass underneath Laura's window (II 119, 140). He also saw a lot of footprints near the gate and showed them to police, even though he felt they were unrecognizable (II 142–143, 157, 161).

Laura was scared, confused and shocked as she spoke with police in her living room for ten to fifteen minutes, but she was able to communicate (II 236; III 195, 197, 198, 232, 235). She told police her assailant was "dark complected and that he was slim and that he had a short haircut with a curly ponytail thing in the back and that he was—I thought he was like in his twenties or so—and that he was wearing a white tank top and blue shorts that were kinda silky and that he had a gap between his two front teeth and that I thought his boxers were white with like blue squares on them and that he said his name was John." (III 104, 195, 220–221).

Chief investigative officer Michael Dunklee dusted the alleged point of entry and Laura's room for fingerprints and was able to get 27 lifts (V 164). Out of those, "several" could have been identified and "several" were smudges (V 165). Eight of the latent lifts were sent to the Automated Fingerprint Identification System (AFIS) for analysis and none of them matched defendant (V 165, 269; VI 94–96). None of the prints matched any "elimination" prints, either (VI 96). Dunklee took Laura's bedding and her pajamas into evidence (V 169, 173). He also took lint tapes of the area to the side of Laura's bed on "another day." (V 172–173).

Police did not start look for a suspect until after they had finished investigating at the Williams home (V 152). Using the description that Laura had given John Newcomer, Dunklee got information of a person matching that description (V 175–176). On August 11, 1998, police set up surveillance at defendant's apartment complex, converged on a car as it was leaving to prevent its "escape," and took defendant into custody (V 196–197, 225, 245). Dunklee described the defendant's appearance that day as "African–American ... short cropped hair almost to the scalp ... ponytail to the rear of the neck at the base of the hairline and ... a gap between his teeth." (V 198). Defendant was released from jail a few days later, but on August 18, 1998, plainclothes police, armed with a search warrant for bodily fluids, took defendant into custody after a short foot chase (V 220–223, 243–244, 245).

Police also searched Nelson's apartment and confiscated underwear that was not boxer shorts, blue nylon shorts, a blue jacket and jeans (V 283–285). They did not find a white tank top (V 285).

Laura went to the hospital, where she told the nurse what had happened and where "they like took swabs and went like that inside me." (II 237; III 209). Nancy Stearley, RN, was in attendance when Laura was examined by a physician and collected blood and lab cultures (III 149). Laura told Michael Sugg, M.D. that her assailant had rubbed his penis against her labia, there was no vaginal penetration and there had been oral penetration with possible ejaculation (V 7). During Laura's gynecological examination, he noted some redness on the inside of her labia that was consistent with what she had described happened to her (V 8–9). He acknowledged that redness could also be consistent

with wiping too hard, an allergy or a non-sexual infection (V 9). He noted that her hymen was intact (V 9). The only reason Stearley spoke with Laura was to gain her cooperation for collecting specimens and she did not remember much of Laura's demeanor at the time, except that she [was] ultimately cooperative and that she did not appear to be traumatized (III 150, 156, 163). Laura denied any physical assault or pain and was not in acute distress (III 160–161; V 10). No vaginal bleeding or discharge was noted (III 161). Laura did not exhibit despondency or signs of overt depression (III 162, V 10). Among the samples collected for the sexual assault kit were various hairs, saliva samples and blood samples (III 152, 154).

Laura went to the jail for a corporeal lineup on August 13, 1998 (II 237; V 57). Dunklee explained to her that the people on the other side of the glass could not see or hear her, the person she saw might or might not be there and that she should look very carefully and not be afraid (II 323; V 50, 202–203). Despite the presence of her mother, Dunklee and "another cop," Laura was nervous at the lineup and when the curtain opened, she recognized "[t]he man that was in my room," as "number three" even though he had no ponytail, but she told police that she did not recognize anyone because she was scared he could see her and would kill her or her family if he got out (II 237–239, 323, 328; V 52, 55, 57, 210). On the way out, Laura told her mother that she wished she could look at "number three" again and see his teeth "[b]ecause if they had a gap then I would be sure that it was him." (II 239–240; V 38, 40, 101). Vicki relayed this information to Dunklee and asked for a second lineup, but Laura was not allowed to see "number three" or his teeth

again (II 240; V 41, 215–216). Dunklee explained that the reason was because he could not find five other jail inmates with that particular gap in their teeth (V 200).

\* \* \* \*

Forensic scientist Tani Watkins of the Michigan State Police Bridgeport laboratory received Laura's sexual assault kit and bedding, defendant's blood sample and sexual assault kit and Larry's and O'Callahan's [the victim's brother] blood and hair samples (IV 141). . . .

She examined the comforter using a laser beam and noticed that five of the stains fluoresced, so she made slides, determined that three of the stains indicated the presence of "a few" spermatozoa and cut the stains out and preserved them (IV 186–188, 207–209, 211, 323, 325). She labeled all of the stains "one through five." (IV 187). She ran additional tests on stains 1 and 5 because her initial test did not show the presence of spermatozoa and the showed the presence of a "rare" spermatozoa (IV 210–211, 217). Stain 1 had the largest volume of semen and had an oval or elongated shape (IV 212, 213). The other four stains were circular (IV 214). Watkins also subjected the stains to secretion typing and learned that stains 1 and 5 indicated the presence of B blood group (IV 218). Defendant has type B blood (IV 260, 330). The other three stains indicated the presence of A blood group (IV 218). O'Callahan and Larry both have type A blood (IV 261, 262). She subsequently sent portions of those samples to an analyst at the State Police's East Lansing laboratory and retained the other portions (IV 191, 246, 256, 317). Watkins also took Laura's and defendant's known blood samples and made dried blood samples for subsequent DNA testing (IV 219–221).

Watkins analyzed three lint tapes containing fibers that had been collected from Laura's bedroom (IV 223). She found hairs on the first and third tapes (IV 223). On the first one, she found a head hair and "several" dark hairs (IV 225). On the third one, she found "a few" dark hairs, a fragment and "maybe another head hair." (IV 225). Her analysis on those samples found that they were not similar to known hair samples of Laura and defendant (IV 225, 308). Three of the hairs on the first tape, according to Watkins's analysis, were Caucasian (IV 226, 228). The other hairs were from an unknown animal (IV 227–228).

Watkins analyzed a pink and blue "patchwork quilt" with a laser for stains, found the presence of bodily fluids, but subsequent analysis showed that none of them were semen (IV 229). She admitted that she could have missed some stains if they did not fluoresce (IV 298–299). Her analysis of a pillowcase did not find anything positive for any bodily fluid (IV 230–231).

At the time the samples were analyzed, the laboratory consisted of one room where from one to three people worked, testing "hundreds" of samples each week (IV 284). Watkins admitted that she did not change her gloves between taking each semen sample, because the gloves were for her protection and not to prevent contamination, but she washed her scissors between cuttings (IV 286–288, 320, 321, 323). Watkins worked on paper that could be torn off "in between." (IV 289). Her bench was cleaned with bleach after each case (IV 290). "It depended" on how often she would change her lab coat, but she usually changed it every other day (IV 292–294). Watkins explained that to prevent contamination, the known samples are analyzed under a hood that is cleaned before and after analysis, on a clean paper (IV 318). There was a 25–day gap between the time the known and unknown samples were analyzed (IV 319). In Watkins's professional opinion, there was no way defendant's known sample could have inadvertently contaminated samples 1 and 5 (IV 324).

Stephen Milligan, forensic scientist at the State Police DNA analysis section in Lansing, initially analyzed five semen stains, two bloodstains identified as Laura's and four bloodstains identified as defendant's (IV 392–393, 407). He opened each known sample individually and put each sample into its own sealed tube (IV 393–395). He opened each unknown sample and put each one into its own sealed microtube (IV 397–398). He changed his gloves between each sample and cleaned his work area between working on the known and unknown samples (IV 399–400, 469–470). He extracted the DNA from the known samples on October 25, 1998 and he extracted the DNA from the unknown samples on October 29, 1998 (IV 403, 443–444). While Milligan extracted DNA from all five unknown samples, he did not test all of them (IV 412).

Milligan's DNA analysis on stain 1 showed that it was a mixed stain (IV 415–417, 495–496). The sperm fraction of that stain matched defendant (IV 418). The fraction was tested three times, first with three genetic markers, then with six genetic markers and finally with 13 genetic markers (IV 418). All 13 genetic markers from the sperm fraction of stain 1 matched defendant (IV 418). Milligan opined that the probability of selecting a non-related person at random form the population that had a DNA profile that matched the sperm fraction of stain 1 was one in 76.6 quadrillion in the African–American popula-

tion (IV 419). In other words, according to Milligan "you would not expect to see that profile in any individual in that [African–American] population." (IV 420). Milligan also found a profile in the female fraction that matched defendant and additional minor types that were consistent with Laura (IV 425).

Milligan's DNA analysis on stain 5 "at a later date" revealed the presence of more than one donor (IV 426–427, 495–496). The DNA profile associated with the major donor matched defendant over the 13 genetic markers and the DNA profile associated with the minor donor of the non-sperm fraction matched Laura over six genetic markers (IV 427). The sperm fraction also matched defendant (IV 427). Milligan opined that the probability of selecting a non-related person at random from the population that had a DNA profile that matched the sperm fraction would be the same as for stain 1 because it was the same profile (IV 428). Milligan also opined that the probability of selecting a non-related person at random from the population that had a DNA profile that matched the non-sperm fraction would be one in 113.7 million in the Caucasian population (IV 431).

Milligan testified that if any of the samples he testified had been contaminated, he would see it as a mixture (IV 457). He admitted that if 450 foreign cells had been deposited, it was possible that they would be tested, but it would be unlikely where there is a rich sample (IV 462–463). He also testified that it would be unlikely that there would be some unobservable spillage or residue when tubes are closed or opened because they are spun down (IV 472). He admitted that contamination could occur in the machine where the DNA tests are run (IV 474). He also testified that if a re-test was done on a contaminated sam-

ple, the results might be slightly different because the number of contaminants would be lower due to prior sampling (IV 476). Over defense objection, he testified that everything he received in this case was properly packaged and submitted (IV 489).

Milligan also testified that he was aware that Lab Corp. had tested samples 2, 3 and 4 and that defendant was excluded, but did not know this information until January, 2001 and does not dispute the results (IV 477–478, 493). He sent all of the samples to Cellmark on September 9, 1999, could not say what samples Lab Corp. had, but received a report from Lab Corp. regarding samples 2, 3 and 4 and O'Callahan's known sample (IV 481–484). Over defense objection, he testified that Cellmark had the tools necessary to independently test samples 1 and 5 (IV 485). He opined that it was not unusual to have multiple contributors on bedding (IV 494).

Charles Barna, DNA unit supervisor for the Michigan State Police did an administrative review of Milligan's conclusions and concurred with them (V 362, 371). He testified that a January 22, 1999 report generated in this case concluded that another black person having the same DNA as defendant was one in 8.5 million, but that after the lab ran a second analysis using additional loci, the numbers got larger (V 375). He agreed that where were not a quadrillion people on earth (V 376). The population studies down in defendant's case were based on a 1999 article from the *Journal of Forensic Science* called *Technical Note: Population Document 13 CODIS for a Short Repeat Loci in African–Americans, U.S. Caucasians, Hispanics, Bahamians, Jamaicans and Trinidadanians* (sic) (V 378). That arti-

cle had a chart that showed that the percentage of African–Americans with an allele 15 locus is 29.048 percent, 31.848 percent of Bahamians have that same allele, 33.763 percent of Jamaicans have that same allele and 31.25 percent of Trinidadians have that same allele (V 379). Barna admitted that he did not know defendant's ancestry, but it did not matter because the overall profile will still be unique (V 380, 383–384). He admitted that there was nothing in the article that said that the likelihood of someone other than defendant leaving the DNA in samples one or five as one in 8.5 million or any number in the quadrillions (V 390–391).

The previous testimony of Dr. Lysle Johnston, Jr., the defense's orthodontic expert, was read into the record. He had conducted research on the effect of orthodontics on African–Americans and their particular kinds of malocclusions. or bad bites (VI 71). Having a diastema, or gap, between the front teeth is a type of malocclusion (VI 73). He opined that about one in ten African–Americans in the United States have gaps in their front teeth (VI 74, 76). He further opined that it was generally thought that black males have a higher frequency of diastemas than black females and that black females have a higher frequency of diastemas than whites (VI 75). In his opinion, the significance of a diastema in the identification of black males is that not having one would rule a person out, but having one would not rule a person in because there would still be a "fairly large pot" of people with diastemas (VI 75). He also testified that it would be less probable that a person would have both a ponytail and a diastema (VI 78). He characterized defendant's diastema as "large, but not extraordinary," and the percentage of people with that type

of diastema could be one in 20, less if the person had a ponytail (VI 79, 80).

Def.-Appellant's Br. on Appeal, in *People v. Skinner,* No. 236876 (Mich.Ct.App.), at 6–21.

## C. *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris,* 489 U.S. at 263, 109 S.Ct. 1038. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review ... of a federal constitutional claim." *Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (quoting *James v. Kentucky,* 466 U.S. 341, 348–51, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)); *see also, Calderon v. United States Dist. Ct. for the E. Dist. of Cal.,* 96 F.3d 1126, 1129 (9th Cir.1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, respondent argues that petitioner first presented his purportedly defaulted

habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3).

The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Skinner*, 474 Mich. 1093, 711 N.W.2d 57 (2006); *People v. Skinner*, No. 262165 (Mich.Ct.App. Oct. 21, 2005). Looking at the structure of Rule 6.508(D), it would appear that this language indicates that petitioner failed to meet the substantive burden of entitlement to relief, rather than failed to comply with one of the procedural aspects of the rule. This, in turn, would not constitute an invocation of a state procedural default barring habeas review of petitioner's claims. Respondent, however, relies on the Sixth Circuit's decision in *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000), in which the court held otherwise and concluded that this identical language constitutes an invocation of the procedural aspects of Rule 6.508(D), and thus bars federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir.2000).

Were *Simpson* the last word on the matter, this Court would of course be bound to follow the Sixth Circuit's holding. However, a more recent decision by the Sixth Circuit has limited the breadth of the *Simpson* rule, rendering it inapplicable here. In *Abela v. Martin*, 380 F.3d 915 (6th Cir.2004), the Court explained that its previous decisions in *Simpson* and *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir.2003), were based on the fact that the lower state courts in those cases had expressly invoked the procedural aspect of Rule 6.508(D)(3), and therefore the court could be fairly certain that the Michigan Supreme Court's citation to "MCR 6.508(D)" was intended as an invocation of the procedural aspect of that rule. In *Abela*, however, the lower courts had addressed the petitioner's claims on the merits, and this was enough to distinguish *Simpson* and *Burroughs*, as the court explained:

> In short, unlike in *Simpson* and *Burroughs*, the state courts below the supreme court never invoked a procedural bar here, but rather repeatedly ruled on the merits. The procedural circumstances in this case are, therefore, materially different from those in *Simpson* and *Burroughs*, where the lower state courts actually invoked a procedural bar, making it clearer that the Michigan Supreme Court was also invoking such a bar when it referred to M.C.R. 6.508(D). But given that all of the lower state courts adjudicated Abela's case on the merits, it is not at all clear that the Michigan Supreme Court's summary order relies on a procedural bar, as opposed to the non-procedural reason that Abela simply failed to meet his burden of "establishing entitlement to the relief requested." Indeed, given the line of prior merits determinations in Abela's case, it is just as reasonable to presume that the Michigan Supreme Court's reference to M.C.R. 6.508(D) signaled its agreement with the lower courts' merits determinations as it is to presume that the reference signaled, for the first time

in this case, the invocation of a procedural bar.

In short, the procedural facts of *Simpson* and *Burroughs* are distinguishable from our case. The facts in *Simpson* and *Burroughs* inspired greater certainty that the Michigan Supreme Court actually relied on a procedural bar in rendering its judgment. No such clarifying indicators are present here. Moreover, *Simpson* and *Burroughs* do not purport to eviscerate our Circuit's rule that a state procedural rule is an "independent and adequate" state ground only if the state court rendering judgment in the case "clearly and expressly stated that its judgment rested on a procedural bar." *Sparkman,* 94 F.3d at 202. *Simpson* and *Burroughs* did not hold that we should divine procedural default from any and all references to M.C.R. 6.508(D) where such default may actually have occurred, but where the procedural history raises genuine questions as to the state court's actual reliance on a procedural bar. To suggest that those cases did so hold is to accept that they invert the inquiry into whether federal review of the habeas claims is permitted. That is, pursuant to *Maupin v. Smith,* 785 F.2d 135 (1986), whether the petitioner actually failed to comply with a procedural rule is only the predicate, not the ultimate, question before us. The ultimate legal questions are whether the court relied on and expressly invoked that procedural bar and whether it is an "independent and adequate" ground for precluding review. *See Williams v. Coyle,* 260 F.3d 684, 693 (6th Cir.2001). If a state court is slurring its words, our job is not to guess what it might be saying, but rather to demand that it enunciate more clearly. Here, because of numerous factors—the Michigan Supreme Court's reference only to M.C.R. 6.508(D), the

absence of a clear and express invocation of a procedural bar, and the plausibility, based on the prior state courts' merits rulings, that the Michigan Supreme Court, too, grounded its decision in a non-procedural reason based on Abela's failure to "establish[ ] entitlement to relief"—we cannot find that M.C.R. 6.503(D)(3), the state procedural rule urged by Respondent, was actually relied on by the Michigan Supreme Court in this case. For the same reasons, we cannot find that M.C.R. 6.503(D) constitutes an adequate and independent basis for the state supreme court's decision here.

*Abela,* 380 F.3d at 923–24; *see also, Williams v. Jones,* 231 F.Supp.2d 586, 597 (E.D.Mich.2002) (Lawson, J.).

■ Here, as in *Abela,* the trial court did not reject petitioner's claims on the basis of his failure to raise those claims on direct appeal, *i.e.,* under the procedural rule set forth in Rule 6.508(D)(3). Rather, the trial court found concluded that the claims had already been raised on direct appeal, and thus were barred by Rule 6.508(D)(2). *See People v. Skinner,* No. 236876 (Genesee County, Mich., Cir. Ct. Feb. 9, 2005). Rule 6.508(D)(2) is a collateral estoppel rule which prohibits a trial court from reconsidering a claim already decided against a defendant on direct appeal. Application of this collateral estoppel rule does not bar federal habeas review. As this Court has explained: "Rule 6.508(D)(2) is simply a *res judicata* rule barring a defendant from relitigating claims in a motion for relief from judgment which were decided adversely to him in a prior state court decision. Because Petitioner's . . . claims were considered on the merits in Petitioner's [direct appeal], there is no bar to habeas review of these claims." *Morse v. Trippett,* 102 F.Supp.2d 392, 402 (E.D.Mich.2000) (Tarnow, J.) (citing *Ceja*

*v. Stewart,* 97 F.3d 1246, 1253 (9th Cir. 1996); *Silverstein v. Henderson,* 706 F.2d 361, 368 (2d Cir.1983)); *accord Correll v. Thompson,* 63 F.3d 1279, 1289 n. 8 (4th Cir.1995).

In short, the only "clarifying indicator" of what the Michigan Court of Appeals and Supreme Court meant by their generic invocation of Rule 6.508(D), *Abela,* 380 F.3d at 923–24, is the trial court's opinion invoking Rule 6.508(D)(2). And because Rule 6.508(D)(2) does not constitute a procedural default barring habeas review, under *Abela* petitioner's claims may be considered on the merits. *See Kaske v. Jones,* No. 05–CV–72675, 2007 WL 1192194, at *9 (E.D.Mich. Apr.19, 2007) (Zatkoff, J.).[1] Accordingly, the Court should conclude that petitioner's claims are not barred by a state court procedural default.

### D. Standard of Review

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also, Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). "A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this]

---

1. There is some question as to whether the prosecutorial misconduct claims raised in petitioner's motion for relief from judgment (and thus, in his habeas petition) are the same as the prosecutorial misconduct claims raised in his direct appeal. Thus, there is a question as to whether the trial court was correct to invoke Rule 6.508(D)(2) rather than the procedural default rule reflected in Rule 6.508(D)(3). This question does not affect this Court's analysis, however. As the Supreme Court has explained, "[t]he mere existence of a basis for a state procedural bar does not deprive [federal courts] of jurisdiction; the state court must actually have relied on the procedural bar as an independent ba-

sis for its disposition of the case." *Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *see also Coleman,* 501 U.S. at 735, 111 S.Ct. 2546 (requiring that the last state court rendering a reasoned judgment on the matter "clearly and expressly" state that its judgment rests on such a procedural bar for the doctrine of procedural default to apply). As explained above, under *Abela* this Court can conclude nothing more than that the state court's actually relied on Rule 6.508(D)(2). Nothing in the state court opinions and orders permits the conclusion that the state courts actually relied on Rule 6.508(D)(3).

precedent.' " *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (per curiam) (quoting *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495); *see also, Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002); *Bell,* 535 U.S. at 694, 122 S.Ct. 1843. "[T]he 'unreasonable application' prong of § 2254(d) (1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams,* 529 U.S. at 413, 120 S.Ct. 1495); *see also, Bell,* 535 U.S. at 694, 122 S.Ct. 1843. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.' " *Wiggins,* 539 U.S. at 520–21, 123 S.Ct. 2527 (citations omitted); *see also, Williams,* 529 U.S. at 409, 120 S.Ct. 1495.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, " § 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams,* 529 U.S. at 412, 120 S.Ct. 1495. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)

(citations omitted) (quoting *Williams,* 529 U.S. at 412, 120 S.Ct. 1495).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537 U.S. at 8, 123 S.Ct. 362; *see also, Mitchell,* 540 U.S. at 16, 124 S.Ct. 7. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox,* 340 F.3d 667, 671 (8th Cir.2003); *Phoenix v. Matesanz,* 233 F.3d 77, 83 n. 3 (1st Cir.2000); *Dickens v. Jones,* 203 F.Supp.2d 354, 359 (E.D.Mich. 2002) (Tarnow, J.).

### E. *Prosecutorial Misconduct (Claims I & II)*

In his first two claims, petitioner contends that the prosecutor engaged in misconduct and the trial court failed to correct the misconduct. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

#### 1. *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal

quotation omitted). "[T]he touchstone of due process analysis ... is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

### 2. *Analysis*

Petitioner raises three prosecutorial misconduct claims. First, petitioner contends that the prosecutor made improper argument regarding the independent DNA testing done by Lab Corp., or, more specifically, the lack of testing done on samples 1 and 5. Second, petitioner argues that the prosecutor improperly commented on his invocation of his right to remain silent. Finally, petitioner contends that the prosecutor improperly expressed his personal opinion regarding the credibility of the witnesses. The Court should conclude that each of these claims is without merit.

### a. *Argument Regarding DNA Testing*

Petitioner's first claim relates to the DNA testing done at petitioner's behest by Lab Corp. Lab Corp. tested samples 2, 3, and 4 that had been collected by the police. These were the samples which revealed the donor to have blood type A, and thus did not match petitioner's. Sample 1 which was donated by a type B donor and was matched through DNA testing by the State Police to petitioner (as was sample 5), was not initially tested by Lab Corp. Sample 5 was not initially provided by the State Police to Lab Corp. Prior to trial, the court entered a stipulation and order requiring the State Police to provide sample 5 to Lab Corp. This order also provided, apparently based on concerns of attorney-client privilege and attorney work product, that the prosecutor "shall not inquire into the chain of custody or other personnel within the Defendant's lab unless sample # 5's chain of custody becomes an issue in the case. [The prosecution] shall not attempt to find out the identity of Defendant's scientific investigator or Defendant's work product." Pet., Ex. 5. Prior to the start of the trial, defense counsel asked the court to preclude the prosecutor from referencing any testing (or lack of testing) on sample 5 during the trial. *See* Jury Trial Tr., Vol. I, at 4–5. In response, the prosecutor stated that he had no intention of exploring this issue so long as defense counsel did not do anything "surprising" at trial, but that the State Police witnesses should be able to testify to the fact of having shipped the samples to Lab Corp. *See id.* at 8–9. The trial court ruled that "[t]here should be no reference to any defense analysis of any sample five or any other sample." *Id.* at 18.

Despite this ruling, the prosecutor did mention the lack of testing on sample five during closing argument. In explaining why samples 2–4 were unimportant, the prosecutor argued:

Five and one are the ones we're saying that's his, that's the defendant's, that's the one we're saying is the defendant's DNA on there. Defense, you've got the samples, you want to independently test it, you want to challenge our beliefs that

five and one's the defendant Germain Skinner, here you have, go at it. And they are given to the defense lab. Lab Corp has all five stains. But there's been no evidence presented by any lab, by anybody that five and one are different than what w[e] say it is. In fact, Lab Corp produces—ah—gives no evidence of what their results of one and five are. Shhh, they're not telling. Their letter only speaks to two, three, four. Use your common sense, everyday experience. We're saying it's five and one. They have five and one independent analysis available for 'em and they're only gonna talk about two, three and four. Folks understand what I'm saying?

*Id.*, Vol. VI, at 224. The prosecutor continued on this theme during his rebuttal argument:

Moreover, want to talk about defense talking about this DNA testing. Defense said, "Well, we had one through—they acknowledge they had one through five—stains one through five available for testing. Now, if I heard Mr. Whitesman correctly, he said, "We tested two, three and four because they were the ones we were interested in." Well, two, three and four were the ones that were not his guy, they were the kid that lived in the household. . . . But he's sa—But I heard Mr. Whitesman say it's two, three and four we're interested in, but one and five, which matched the defendant? If I understand correctly, he's not saying he's interested in testing that. One and five, we're saying matched the defendant. Here you go, independent analysis. You got a problem with it, go test it. And if I heard him saying, "We weren't interested in testing that." Now, I don't know what Lab Corp did with samples one and five, but we do know they put no results into evidence, which means they did one or two things,

either they didn't test, which defies logic, why they—

MR. WHITESMAN: I've—I have got to object, okay, I've got to object. Now, there's no evidence with regard to this—to Lab Corp tested one and five. I just said—We've—We've been through that.

THE COURT: There is no evidence what was done, if anything, with respect to one and five. Now, we've been over that—

MR. BERKMAN: And I just said that.

THE COURT:—about 30 times. Okay. Thank you.

MR. BERKMAN: And that's my point. They're not putting in any evidence [on] one and five, which means one of two things. Either they didn't test one and five, which to me defies logic that we've got the sample saying it's your guy, Mr. Whitesman, if you've got a problem with our conclusions or our analysis, go test it, and they didn't test it, one possibility; or they tested one and five and they're not disclosing the results. But it's one or the other. Either you tested it or you didn't test it. Okay. You see what I'm saying? He had one and five. They matched the client. We're saying they matched the defendant. They were available for testing. And they were provided for testing and the raw material, the raw comforter was provided for the testing. And Lab Corp is silent on the results for one and five.

MR. WHITESMAN: I'm gonna object. Judge, there are no results for one and five—

THE COURT: Yes, it's correct—

MR. WHITESMAN:—'cause one and five were not tested.

THE COURT:—Thank you. We have heard that. Now, I've—I agree with you.

*Id.* at 316–18.

■ Petitioner claims that the prosecutor's argument violated the state court's evidentiary ruling, invaded the attorney-client privilege, and improperly argued facts not in evidence. The first two arguments do not afford a basis for habeas relief. It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir.1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws"). Thus, the prosecutor's violation of the court's evidentiary ruling, standing alone, does not entitle petitioner to habeas relief. *Cf. Rodriguez v. Peters*, 63 F.3d 546, 559 (7th Cir.1995); *Elliott v. Meyers*, 691 F.Supp. 190, 192 (N.D.Cal.1988). Similarly, the attorney-client privilege is a creation of the common law, and not of the federal constitution. *See Lange v. Young*, 869 F.2d 1008, 1012 n. 2 (7th Cir. 1989). Because habeas review is limited to violations of the federal Constitution, a violation of a petitioner's attorney-client privilege does not warrant federal habeas relief. *See Smith v. Moore*, 137 F.3d 808, 819 (4th Cir.1998); *Lange*, 869 F.2d at 1012 n. 2. Further, even if the prosecutor's comments could be viewed as an attempt to penetrate the attorney-client privilege, the attempt was not successful. *See Hardaway v. Withrow*, 147 F.Supp.2d 697, 705 (E.D.Mich.2001) (Tarnow, J.) (habeas relief not warranted based on prosecutor's questions which sought to invade the attorney-client privilege where no privileged communications were disclosed).

This leaves petitioner's claim that the prosecutor's comments amounted to arguing facts not in evidence. It is well-established that "[s]tatements by a prosecutor in closing argument are not proper if they bring to the attention of the jury facts not in evidence." *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir.2001). Even assuming, however, that the prosecutor's argument amounted to arguing facts not in evidence,[2] petitioner is still not entitled to habeas relief because the prosecutor's argument did not deny him a fair trial. As indicated above, petitioner's counsel and the court corrected the prosecutor, explaining that there was no evidence that any testing had been done by Lab Corp. on samples one and five. The trial court explicitly agreed with counsel's assertion that one and five had not been tested. Because the prosecutor's misstatement was corrected by defense counsel and the court, petitioner cannot show that he was denied a fair trial by the prosecutor's comments. *See United States v. Ramirez*, 176 F.3d 1179, 1183 (9th Cir. 1999) (misstatement corrected by court); *Girardin v. Pyle*, 752 F.Supp. 979, 983 (D.Colo.1990), *aff'd*, 936 F.2d 582 (10th Cir.1991) (misstatement corrected by defense counsel); *cf. Millender v. Adams*, 187 F.Supp.2d 852, 876 (E.D.Mich.2002)

**2.** The prosecutor did not explicitly argue that samples one and five had actually been tested by petitioner. Rather, the prosecutor argued that no test results had been produced, and thus the jury could infer, among other possibilities, that the test had been conducted and the results were adverse to petitioner. Because it does not affect the results, the Court can assume that the prosecutor's comments amounted to an argument based on facts not in evidence.

(Rosen, J.) (misstatement corrected by prosecutor later in closing argument). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Comment on Invocation of Right to Remain Silent

Petitioner also contends that the prosecutor commented on his invocation of his right to remain silent and shifted the burden of proof by commenting on the lack of defense testing regarding samples 1 and 5, and by comments relating to petitioner's inability to explain various aspects of the evidence. Specifically, in addition to the comments set forth above concerning the testing, the prosecutor commented:

- "He has no accounts for his whereabouts during that time in the morning. He's last s—And—And Mr. Whitesman talks about distance, he's 4.1 miles away." Trial Tr., Vol. VI, at 340.

- "Okay. Within ten minutes away, definitely not halfway across Genesee County, said 4.1 miles away, this defendant, who's—ah—been outside of the house, he's been gone during this time period, he had left at 2:30, whereabouts unaccounted for, happens to match the description given by Laura Williams, who happens to pick him out of this very good lineup, who also happens to leave semen at the stain [sic] that matches him directly, DNA for DNA, his blood against the semen in the comforter, DNA to DNA, all 13 loci comparison matching him, not just in one stains [sic], but two separate stains, tested and analyzed separately." Id. at 340–41.

- "Ladies and gentlemen, use your common sense—Oh, and that same defendant, who is out at that time, and his whereabouts unknown except for the person who saw him. That person

who saw him is Laura Williams." Id. at 344.

- "[F]or two hours [defense counsel] talked, but he never explained why a girl—an 11–year–old girl, who the defendant's a complete stranger to, she describes him to a T, who happens to have his semen on her comforter. Never heard an explanation for that because the explanation for it is that man, the defendant right there, put that semen on that comforter when he ejaculated into Laura Williams' mouth." Id. at 315.

The Court should conclude that these comments did not impermissibly comment on petitioner's silence or shift the burden of proof.

 Although a prosecutor's indirect comment on a defendant's failure to testify or produce evidence, such as a statement that the prosecutor's evidence is uncontradicted, may be unconstitutional, not every such comment is impermissible. Rather, the constitutionality of the indirect reference depends on the circumstances of the case. See, e.g., Lockett v. Ohio, 438 U.S. 586, 594–95, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). A prosecutor may comment on a defendant's failure to call witnesses or offer other evidence to support his factual theories so long as the prosecutor's comment does not implicate a defendant's right not to testify. See United States v. Bautista, 23 F.3d 726, 733 (2d Cir.1994); United States v. Williams, 990 F.2d 507, 510 (9th Cir.1993); United States v. Sensi, 879 F.2d 888, 900 (D.C.Cir.1989); United States v. Dahdah, 864 F.2d 55, 59 (7th Cir.1988). In order to conclude that the prosecutor's remarks amounted to an impermissible comment on petitioner's failure to testify, the Court "must find one of two things: that the prosecutor's manifest intention was to comment upon the accused's failure to testify or that the remark was of

such a character that the jury would naturally and necessarily take it to be a comment of the failure of the accused to testify." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir.1981) (internal quotations omitted); *accord Byrd v. Collins*, 209 F.3d 486, 533–34 (6th Cir.2000); *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir.1988). The Sixth Circuit has established a four factor balancing test to be used in determining the constitutionality of a prosecutor's indirect reference to a defendant's failure to testify: (1) whether the comments were intended to reflect on the accused's silence or were of such a character that the jury would necessarily take them as such; (2) whether the remarks were isolated or extensive; (3) whether the evidence of guilt was otherwise overwhelming; and (4) the nature and effect of any curative instructions given by the court. *See Byrd*, 209 F.3d at 533–34; *United States v. Moore*, 917 F.2d 215, 225 (6th Cir.1990); *Lundy v. Campbell*, 888 F.2d 467, 478 (6th Cir.1989); *Lent*, 861 F.2d at 975.

■ After applying these factors to petitioner's claim, the Court should conclude that the prosecutor's comment did not violate petitioner's constitutional rights. First, there is no indication that the comments were manifestly intended to comment on petitioner's exercise of his right not to testify, or that the jury took them as such. Indeed, the comments are very similar to those made by the prosecutor in *Byrd, supra*, which the Sixth Circuit concluded were not manifestly intended to comment on the petitioner's silence. *See Byrd*, 209 F.3d at 534. The prosecutor's comments were neither "manifestly intended" to comment on petitioner's failure to testify, nor would the jury have "naturally and necessarily" taken the comments to be such. Rather, as the context clearly demonstrates, the prosecutor's comments were intended to highlight that defense counsel's version of events was highly implausible in light of the uncontradicted evidence presented by the prosecution, and that the only logical conclusion from the evidence was that petitioner was inside the house and had sexually assaulted the victim. The prosecutor's comments were merely directed at the weaknesses of petitioner's factual claims. And it is well "established that the government may comment on a defendant's failure to call witnesses to support his factual theories." *Bautista*, 23 F.3d at 733; *accord United States v. Robles–Vertiz*, 155 F.3d 725, 731 (5th Cir. 1998).

As to the second factor, the prosecutor's comments were relatively isolated. Although the prosecutor did make several comments which highlighted the weakness of petitioner's theory of the case, these comments occurred in the course of a trial which (excluding *voir dire*) lasted five days and generated over 1,900 pages of transcripts. Indeed, closing and rebuttal arguments alone lasted nearly four hours and encompass 150 transcript pages. *See* Trial Tr., Vol. VI, at 194–346. Considering the length of the trial and the volume of evidence presented to the jury, the prosecutor's comments were brief. *See United States v. Epley*, 52 F.3d 571, 577 (6th Cir.1995); *Moore*, 917 F.2d at 225.

With respect to the third factor, there was substantial evidence of petitioner's guilt presented at trial. Most notably, the victim gave detailed testimony against petitioner, had given a description of the petitioner (whom she had never met), and petitioner's semen was found on the victim's comforter. Finally, with respect to the fourth factor, the trial court gave an appropriate curative instruction. In its instructions to the jury, the court specifically noted that the prosecution bears the burden of proof, that petitioner was presumed

innocent, and that petitioner had no obligation to produce any evidence whatsoever. The court also instructed the jury that the defendant has no obligation to testify, or to prove his innocence in any manner. *See* Trial Tr., Vol. VII, at 17–19. Further, the court instructed the jury that its verdict must be based solely on the evidence, and that the arguments of counsel are not evidence. *See id.* at 19–20. These curative instructions, even though given during the general jury instructions and not at the time of the prosecutor's statements, weigh in favor of finding that the prosecutor's comment was not unconstitutional. *See Scott v. Elo,* 302 F.3d 598, 603–04 (6th Cir.2002); *Epley,* 52 F.3d at 577; *Moore,* 917 F.2d at 225; *Spalla v. Foltz,* 788 F.2d 400, 404 (6th Cir.1986); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 369 (S.D.N.Y. 1999).

In short, the prosecutor's comments were not manifestly intended to comment on petitioner's silence or suggest that petitioner had the burden of coming forward with any evidence, nor would they have been interpreted by the jury as doing so. Further, the comments were isolated relative to the length of the trial, there was significant evidence against petitioner, and the court properly instructed the jury regarding the burden of proof, petitioner's right to remain silent, and the evidence upon which its verdict should be based. In these circumstances, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Personal Opinion of Witness Credibility

Petitioner also contends that the prosecutor committed misconduct by expressing a personal opinion regarding the credibility of the witnesses. In support of this claim, petitioner points to three comments made by the prosecutor during rebuttal argument. First, the prosecutor responded to defense counsel's closing argument suggestion that the State Police properly tested samples two, three, and four, but did not properly test samples one and five:

> But more interestingly to me, [defense counsel] says, "Well, Tani Watkins, for stains two, three and four, she did a fine job collecting those," because those show that it's the step-brother. All right. For that, apparently, she does okay. But for the two stains, one and five that are his client, there she's no good. You see what I'm saying. See, he wants his cake both ways. Two, three, and four, when she cu-cut those out, "Oh, that-that's fine, that's fine. We like those results. See—See, look what our lab said on those results, but for one and five, Tani Watkins is not good, our lab's no good," and of course, his lab is quiet on that issue. Folks, the reality is—the reality behind the words is Tani Watkins is fine, two, three and four, and one and five. As she testified to . . . .

Trial Tr., Vol. VI, at 323. Next, the prosecutor responded to defense counsel's attack on the testimony of the victim:

> Now, let's take Officer Dunklee off the stand—Sergeant Dunklee off the stand and put an 11–year–old kid in there. And let's not just go with direct examination, let's not go with cro—just cross, but redirect, re-cross, re-recross, re-re-cross, re-re-direct, not just one time, not just two times, but three times. I'm amazed the kid could get her name right. I don't know if I could. And then we say about here [sic] testimony about what it is. Did she change any? In all there was inconsistencies was [sic] any major facts? No. Everything he's talking about is a detail. You know, when this—the c-stains dripped [d]own onto your leg did he wipe it off or did you wipe it off, not that the strain [sic] didn't drop out, she's been consistent, he

ejaculated in my mouth, it dropped down. No problem. No inconsistency. Every single time she's testified.

Let's take a look at the basis facts. Let's take a look how they compare . . . .

*Id.* at 333. Finally, responding to defense counsel's attack on the victim's description of her assailant, the prosecutor argued:

> . . . . That's the description Laura Williams gave. And the testimony she ga—and—and you can see the man for yourself. That description of this man, who happens to also leave the semen that leaves the—the same genetic markers as the semen stains there. So the man she described is the same man, the defendant; and the genetic markers in the semen are the same as the defendant.
>
> Ladies and gentlemen, use your common sense—Oh, and that same defendant, who is out at that time, and his whereabouts unknown except for the person who saw him. That person is Laura Williams.
>
> Ladies and gentlemen, when you go back in the jury room to deliberate, use common sense, every day experience, look at all the evidence, go on your collective memory what you remember the witnesses testified to and the facts, as produced.

*Id.* at 344–45. The Court should conclude that none of these statements constitutes impermissible vouching.

■■ Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front

of the jury." *United States v. Francis,* 170 F.3d 546, 550 (6th Cir.1999); *see also, United States v. Emuegbunam,* 268 F.3d 377, 404 (6th Cir.2001).[3] Here, the prosecutor's comments did not place the prestige of the government behind the witnesses by making personal assurances of a witness's veracity, nor did the prosecutor imply that he knew of facts that had not been introduced. Rather, the prosecutor pointed to the testimony and evidence which supported the witnesses' testimony and the implausibility of defense counsel's arguments, and suggested that the jury use its common sense in evaluating petitioner's argument that these witnesses were not credible. Thus, the prosecutor's comments were merely a fair characterization of the evidence presented to the jury based on his summation of that evidence. As such, they did not constitute impermissible vouching for the credibility of the witnesses or the guilt of petitioner. *See, e.g., Nichols v. Scott,* 69 F.3d 1255, 1283 (5th Cir.1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear,* 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz,* 773 F.2d 711, 717 (6th Cir.1985) (prosecutor may argue permissible inferences from the evidence); *United States ex rel. Williams v. Washington,* 913 F.Supp. 1156, 1163 (N.D.Ill. 1995) (prosecutor's assertion during closing argument that the defendant had "lied" did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable inferences drawn from the physical evidence and witness testimony[.]").

■ Further, "[i]t is well established that juries are allowed to draw upon their

---

**3.** Some cases referring to only the first type of comment as "vouching" and describe the sec- ond type of comment as "bolstering." *See Francis,* 170 F.3d at 551.

own experience in life as well as their common sense in reaching their verdict. While common sense is no substitute for evidence, common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." *U.S. v. Durham,* 211 F.3d 437, 441 (7th Cir.2000) (internal quotation omitted). Thus, the prosecutor was permitted to urge the jury to use its common sense in evaluating petitioner's alibi evidence. *See United States v. Catano,* 65 F.3d 219, 228 (1st Cir.1995); *United States ex rel. Hamilton v. Ellingsworth,* 692 F.Supp. 356, 366 (D.Del.1988).

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these claims.

## F. *Amendment of Charges*

Finally, petitioner contends that he was denied due process of law when the trial court added a charge to the jury instructions which was not set forth in the Information. Along with the CSC charges, petitioner was charged with home invasion. Specifically, the Information charged: "The defendant did break and enter a dwelling at 1090 LuCharles with the intent to commit Criminal Sexual Conduct, a felony, therein, while Laura Williams was lawfully present in the dwelling." Trial Tr., Vol. VII, at 28. In instructing the jury on the elements of this offense, however, the court instructed that the offense could be proven in one of two ways. The first involved the traditional elements of breaking and entering. The second required only entry without permission, and did not include the element of "breaking." *See id.* at 31–33. Petitioner's counsel objected, arguing that the prosecution was "stuck" with the breaking and entering theory pleaded in the Information. *See id.* at 43. The prosecutor argued that the court's instructions merely reflected two ways to prove the same crime, and that the in-

structions adequately reflected the evidence adduced at trial. *See id.* at 45. The trial court agreed with the prosecutor, noting that "[i]t's the same statute, it's the same penalty, and it's an alternative theory[.]" *Id.* The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 1. *Clearly Established Law*

The Sixth Amendment provides, in relevant part, that a criminal defendant has the right to "be informed of the nature and cause of the accusation" against him. U.S. CONST. amend VI. Notice and an opportunity to defend against the charges as guaranteed by the Sixth Amendment are an integral part of the due process protected by the Fourteenth Amendment, and are accordingly applicable in state prosecutions. *See Cole v. Arkansas,* 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948); *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The complaint or indictment challenged need not be perfect under state law so long as it adequately informs the petitioner of the crime in sufficient detail so as to enable him to prepare a defense. Thus, "[a]n indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall,* 806 F.2d 636, 639 (6th Cir. 1986); *see also, United States v. Buckley,* 689 F.2d 893, 899 (9th Cir.1982); *Ransom v. Davis,* 613 F.Supp. 430, 431 (M.D.Tenn. 1984), *aff'd,* 767 F.2d 921 (6th Cir.1985). "[A] charge is sufficiently specific when it contains the elements of the crime, permits the accused to plead and prepare a defense, and allows the disposition to be used as a bar in a subsequent prosecution." *Fawcett v. Bablitch,* 962 F.2d 617, 618 (7th Cir.1992).

## 2. *Analysis*

Here, even though the charging document alleged that petitioner committed a home invasion by breaking and entering, petitioner had sufficient notice of the charges to defend against the home invasion charge as instructed by the court. The Michigan home invasion statute treats breaking and entering and entering without permission as equivalents. The statute provides:

A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:

(a) The person is armed with a dangerous weapon.

(b) Another person is lawfully present in the dwelling.

MICH. COMP. LAWS § 750.110a(2). Thus, "breaking and entering" home invasion and "entry without permission" home invasion are not two separate crimes, but merely alternative methods in which the single crime of home invasion may be proved to the jury. *See People v. Reeves*, No. 240138, 2003 WL 21661885, at *1 (Mich.Ct.App. July 15, 2003) (per curiam).

Here, therefore, the court's instructions on the elements of home invasion did not "effectively alter the substance of the [information]." *Martin v. Kassulke*, 970 F.2d 1539, 1543 (6th Cir.1992). Contrary to petitioner's argument, a charging document need not give "notice of the exact method by which the criminal actions were alleged to have been committed." *Id.* As the Sixth Circuit explained, "[a] variance is not material, or does not rise to the level of a constructive amendment, unless the variance misleads the accused in making her defense or exposes her to the danger of double jeopardy." Here, the only difference between the "breaking and entering" and "unauthorized entry" theories was the requirement of a common-law "breaking." However, because petitioner raised a general defense that he simply did not commit any of the acts charged, the addition of the unauthorized entry element did not impair his ability to defend himself. The breaking element was simply never an issue at trial. In these circumstances, petitioner was not denied adequate notice of the charges against him, and was able to adequately defend against the charges made by the prosecution. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

## G. *Conclusion*

In view of the foregoing, the Court should conclude that petitioner was not denied a fair trial by any prosecutorial misconduct, and that he received adequate notice of the charges against him. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

## III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas*

*v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.1991). *Smith v. Detroit Federation of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Aug. 13, 2007.